## DIVERSION LAKE CLUB v. R. W. HEATH ET AL.

No. 6515.  Decided October 2, 1935.
Rehearing overruled October 30, 1935.
(86 S. W., 2d Series, 441.)

130

*Templeton, Brooks, Napier & Brown* and *W. L. Matthews,* all of San Antonio, for plaintiff in error Diversion Lake Club.

It was error for the court to hold that defendants in error, Heath and others, could, without claim, right, or title other than as members of the general public, have a right to enter upon and fish in that part of Diversion Lake within the bounds of plaintiff in error's land and situated entirely within the enclosed premises of plaintiff in error. State v. Black Bros., 116 Texas, 615, 297 S. W., 213; King v. Schaff, 204 S. W., 1039; Motl v. Boyd, 116 Texas, 82, 286 S. W., 458; Manry v. Robison, 122 Texas, 213, 56 S. W. (2d) 438.

Defendants in error, without claim other than as members of the general public, had no right to fish in the waters of Diversion Lake, which is a body of flood water impounded and collected upon land belonging to plaintiff in error and situated entirely within enclosed premises, since such flood waters were impounded under authority of the State of Texas, acting through its proper governmental agency. Finn & Feather Club v. Thomas, 138 S. W., 150; Fisher v. Barber, 21 S. W. (2d) 569.

*Ocie Speer,* of Austin, *Ben H. Kelly* and *Marcus W. Davis,* of San Antonio, for defendants in error.

The navigable streams and fish therein are public property belonging to the State of Texas and cannot be appropriated to exclusive private or individual use by the Board of Water Engineers. Stephenson v. Wood, 119 Texas, 564, 34 S. W. (2d) 246; State v. Bradford, 121 Texas, 515, 50 S. W. (2d) 1065.

The case is not moot. Ferguson v. McCallum, 122 Texas, 122, 53 S. W. (2d) 753; Lacoste v. Duffy, 49 Texas, 767; Gordon v. State, 47 Texas, 208; 3 Texas Jur., 966.

MR. JUDGE SMEDLEY delivered the opinion for the court.

This case presents the interesting and important question: Do the public have the right to fish in a lake created by the lawful construction of a dam across a river not navigable in fact, but declared to be navigable by statute, or does the exclusive right to fish in such lake belong to one who owns both the bed of the lake, except that part of same which was originally the bed of the river, and the land bordering the lake on both sides?

In the year 1911 and 1912, as part of an irrigation project and under authority given by the statutes pertaining to the appropriation of water for irrigation and other purposes, two dams were built across the Medina River and two lakes formed, the upper lake covering 5,800 acres and the lower lake, known as Diversion Lake, covering about 150 acres when full. Prior to the construction of the dam, Medina River, which is described as being as old as the watershed and as draining about 700 square miles, was not navigable in fact, but it was, according to the verdict of the jury, which is not questioned here, a navigable stream as defined by Article 5302 of the Revised Civil Statutes of 1925 (the Act of 1837), in that it retained an average width of more than 30 feet from its mouth up to the upper dam. The surveys pursuant to which the land in the vicinity of the two lakes was granted by the State, in accordance with the mandate of the statute, front on the river and do not cross it. Thus the title to the bed of the river was reserved to the State.

Plaintiff in error Diversion Lake Club, a corporation formed about the year 1926, became the owner of two strips of land, each about 1,500 feet in width and 4 miles in length, fronting on what were originally the two banks of the river, and extending from the dam forming Diversion Lake up to the dam forming the main or upper lake, but not including either the

bed of the river or a public road which crosses Diversion Lake near its upper end.

Plaintiff in error constructed a deer proof fence around the land which it acquired, stocked the lake with fish procured from the United States Government, and improved the property for the use of its members for fishing, hunting, boating and bathing.

Defendants in error, citizens of the State and residents of Bexar and Medina Counties, entered the waters of Diversion Lake and fished in it by placing their boats into the water from the low bridge on which the public road crosses the river and the lake near the upper end of the lake. Thus they were able to obtain access to the waters of the lake without trespassing upon the property of plaintiff in error unless they became trespassers when they fished in the water above that part of the bed of the lake to which plaintiff in error has title.

This suit was filed by plaintiff in error to enjoin defendants in error from fishing in the waters of the lake or taking fish therefrom or trespassing upon the land owned by plaintiff in error under and surrounding the lake. Defendants in error, Heath, Matthews and Self, by their answers asserted rights as members of the public to use the waters of the lake for fishing as part of the water of a navigable stream belonging to the State for the benefit of the public in general. They asserted also the right to use the banks of the lake for fishing, and sought by cross-action to enjoin plaintiff in error from interfering with them in the exercising and enjoyment of their rights so to use the water and banks of the lake.

The trial court rendered judgment granting plaintiff in error a permanent injunction restraining defendants in error from going on or over, or trespassing upon, or using for fishing, any of the land owned by plaintiff in error surrounding the waters of Diversion Lake, and granted defendants in error a permanent injunction restraining plaintiff in error from interfering with them in their right to fish in the waters of the lake and directed that the fences of plaintiff in error across the river and lake be so maintained as not to prevent defendants in error from going up and down the lake in boats and fishing in its waters. This judgment as affirmed by the Court of Civil Appeals. 58 S. W. (2d) 566.

■ The first contention made by plaintiff in error is that, because it is the owner of all the land on both sides of Diversion Lake and the Medina River where the lake was formed, it

has the exclusive right to fish in the waters of the lake and the river adjoining its land. The contention is based upon the rule of the common law that the owner of land upon both sides of a navigable river above the ebb and flow of the tide has the exclusive right of fishing in the stream to the extent that it flows through his land, and upon the adoption by the State of Texas in 1840 of the rules of the common law.

The authorities do indicate that the common law of England gave to the owners of land along navigable rivers above the ebb and flow of the tide the exclusive right to fish in such rivers. Hartman v. Tresise, 36 Col., 146, 84 Pac., 685, 4 L. R. A. (N. S.), 872; Schulte v. Warren, 218 Ill., 108, 75 N. E., 783; Willow River Club v. Wade, 100 Wis., 86, 76 N. W., 273, 42 L. R. A., 305; Kinney on Irrigation and Water Rights (2nd Ed.), Vol. 1, p. 605; Farnham's Water and Water Rights, Vol. 2, p. 1364; 26 C. J., p. 598; Kent's Commentaries (11th Ed.), Vol. 4, p. 525.

This exclusive right to fish, however, was given to the adjoining land owners by the common law of England by reason of the fact that they were the owners of the beds of the rivers above tide water. Farnham, in discussing the right to fish in nontidal water in England, says:

"In England the King's title to the water depends upon its tidal character, and, since the right to fish follows the title to the water, his right, and therefore the right of the public, to fish went no farther than the flow of the tide." Farnham's Water and Water Rights, Vol. 2, p. 1364.

Similarly, Kinney, in discussing the rule of the common law, says:

"The right to fish in, or to hunt on certain waters, in the absence of grants or prescriptions, is in harmony with the ownership of the soil under those waters; if the title to the soil is in the State, the right to fish or hunt is in the public; but upon the other hand, if the title to the soil is in the riparian owner, he has this right." Kinney on Irrigation and Water Rights (2d Ed.), Vol. 1, p. 605.

■ The general rule is well established by the authorities that the right to fish in a stream, whether belonging to the public in common or exclusively to the owners of the land bordering the stream, is determined by the ownership of the bed. The Supreme Court of Illinois so held in Schulte v. Warren, 218 Ill., 108, 75 N. E., 783. Similarly, it was held by the Supreme Court of Colorado, in Hartman v. Tresie, 36 Colo, 146, 84

Pac., 685, 4 L. R. A. (N. S.), 872, that at common law the exclusive right to fish in a stream above the ebb and flow of the tide belongs to the adjoining land owner as an incident of his ownership of the bed of the stream. People v. Truckee Lumber Co., 116 Cal., 397, 48 Pac., 374, 39 L. R. A., 581, 58 Am. St. Rep., 183, holds that the common right to take fish extends to all waters the lands underlying which are not in private ownership, whether the water is navigable or not. The court announced the rule in Herrin v. Sutherland, 74 Mont., 587, 241 Pac., 328, 42 A. L. R., 937, with citation of cases from several states, that in this country the right of fishing in all waters, the title to which is in the public, belongs to all the public in common. It then, after pointing out that the State of Montana is the owner of all land below the water of a navigable stream, concluded:

"Perforce, then, the waters above the bed or channel of a navigable stream at low water mark are public waters and in this the public have a right to fish."
See also: Thompson v. Parker, 132 Ark., 316, 200 S. W., 1014; Gratz v. McKee (U. S. C. C. A.), 270 Fed., 713, 23 A. L. R., 1393; note, 11 A. L. R., p. 241, and following; note, 60 L. R. A., pp. 486-7.

■ A rule of the common law of England which gave to owners of land along navigable streams above tide water the exclusive right to fish in such streams because of their ownership of the beds of the streams can have neither application nor value in determining the right to fish in navigable streams in Texas, the beds of which are owned by the State for the benefit of the public.

The doctrine of the common law of England that the title of the owner of land bordering on a river above the ebb and flow of the tide extends to the middle of the stream, while adopted in some of the states, has been rejected by many of them, particularly by those which, like Texas, have been touched by the civil law, as inappropriate and inapplicable to the waters of this country; and the rule of many of the states, often referred to as the better rule of the civil law, is that rivers which are navigable in fact are public, and that the beds of such rivers belong to the State. Manry v. Robison, 122 Texas, 213, 232, 56 S. W. (2d) 438; Packer v. Bird, 137 U. S., 661, 34 L. Ed., 819; 27 R. C. L., pp. 1360-1361; Gould's The Law of Waters, Sec. 67, pp. 135-136; Farnham's Water and Water Rights, Vol. 1, pp. 253-256.

■ ˙ In general it is held that all members of the public have a common right of fishing in navigable streams and all other public waters. The rule is thus stated by Kinney: "The general rule in this country is that the right of hunting and fishing by all the members of the public is not confined to tidal waters, but has been extended to all of the public waters of the country which, as we have seen, are those waters that are navigable in fact." Kinney on Irrigation and Water Rights (2d Ed.), Vol. 1, p. 606. Farnham says: "The right of fishing in all waters, the title to which is in the public, belongs to all the people in common." Farnham's Water and Water Rights, Vol. 2, p. 1363. See also: Herrin v. Sutherland, 74 Mont., 587, 241 Pac., 328, 42 A. L. R., 937; Hume v. Rogue River Packing Co., 51 Ore., 237, 83 Pac., 391, 92 Pac., 1065, 31 L. R. A. (N. S.), 396, 131 Am. St. Rep., 732; 26 C. J., p. 602; 11 R. C. L., p. 1029.

In the states which reject the tidal test of navigability and public ownership, rivers navigable in fact are navigable in law, they are public rivers, and their beds as a rule are owned by the state, and both because of their navigability and because of the state's ownership of their beds, they may be used by the public for navigation, fishing and other lawful purposes.

■ But it is said that Texas adopted the common law and with it the rule giving to land owners the exclusive right to fish in all nontidal rivers. As has been shown, the rule has no proper application, because of the absence here of the reason for the rule, namely, private ownership of the beds of navigable nontidal rivers. However, even if the reason for the rule is disregarded, still it has not been adopted in Texas, because only so much of the common law of England has been adopted as is not inappropriate to the conditions and circumstances of the people and not in conflict with our Constitution and laws. Art. 1, R. S., 1925; Act approved January 20, 1840, 2 Gammel's Laws, p. 177; Grigsby v. Reib, 105 Texas, 597, 601, 153 S. W., 1124, L. R. A., 1915-E, 1 Ann. Cas., 1915-C, 1011; Swayne v. Lone Acre Oil Co., 98 Texas, 597, 605, 86 S. W., 740, 69 L. R. A., 986, 8 Ann. Cas., 1117; Clarendon Land I. A. Co. v. McClelland Bros., 86 Texas, 179, 185, 23 S. W., 576, 1100, 22 L. R. A., 105; Davis v. Davis, 70 Texas, 123, 7 S. W., 826; Motyl v. Boyd, 116 Texas, 82, 115, 286 S. W., 458.

Chief Justice Cureton in Manry v. Robison, 122 Texas, 213,

232-233, 56 S. W. (2d) 438, cited numerous instances in which the courts of this State, when deciding questions of navigability of waters and of title to their beds, have departed from the common law and adopted or followed the rules of the civil law, and expressed the conclusion that: "These illustrations suffice to show that as to the law of streams we have only adopted such rules of the common law as are suitable to our conditions and as are in harmony with the basic principles of our jurisprudence with reference to the law of waters."

It is apparent that a rule of the common law giving to land owners the exclusive right to fish in navigable rivers is out of harmony with the basic principles of the jurisprudence of a state which, pursuant to a statute in effect prior to the adoption of the common law and held to be but an adaptation of the previous laws of Mexico (State v. Grubstake Inv. Ass'n, 117 Texas, 53, 62-63, 297 S. W., 202), has jealously reserved for the benefit of its citizens the title to the beds of even very small streams.

■ The common law rule as to the right of fishing in navigable nontidal streams was not adopted by the act of 1840 for the additional reason that such rule was clearly inconsistent with Article 5302, Revised Civil Statutes of 1925, in effect since 1837, which was intended and was effective to make all streams navigable in law and public which have an average width of thirty feet, whether they are actually navigable or not, and which reserved the beds of all such streams to the State. City of Austin v. Hall, 93 Texas, 591, 57 S. W., 563.

That statute, it is to be observed, does not undertake to accomplish the impossible and convert nonnavigable streams actually into navigable waters. It states that streams of the average width of thirty feet *"shall be considered"* navigable streams, thus placing them by the force of the statute in the same class as streams navigable in fact, and giving them the same quality and character as streams actually navigable, in respect to the title to their beds and their enjoyment and use by the public. The statute was so construed in City of Austin v. Hall, supra, and that decision has been consistently approved and followed by the Supreme Court.

In State of Texas v. Bradford, 121 Texas, 515, 528, 530, 50 S. W. (2d) 1065, where the subject matter of the cause was a stream navigable by virtue of the statute, Associate Justice Sharp, writing as commissioner the opinion of the Court, said, after quoting Article 5302, and with citation of

Austin v. Hall, supra, and many other decisions:

"The rule long has been established in this State that the State is the owner of the soil underlying the navigable waters, such as navigable streams, as defined by *statute*, lakes, bays, inlets and other areas within tide water limits within its borders. If that section of the river where these surveys in controversy were made, be navigable, its bed undoubtedly is the property of the State under that rule. In a long line of decisions the courts of this State have consistently held that the public policy and laws of this State prohibit surveys to be made across navigable streams so as to include the soil under the bed thereof." (Our italics.)

He further said, citing authorities:

"From its earliest history this State has announced its public policy that lands underlying navigable waters are held in trust by the State for the use and benefit of all the people."

In Chicago, Rock Island, etc., Ry. Co. v. Tarrant County Water Control and Improvement District No. 1, 123 Texas, 432, 446, 73 S. W. (2d) 55, it was held that a franchise given by statute to a railway corporation to construct its road across certain streams navigable by force of the statute was subordinate to the power of the State to preserve the rights of the public in such streams and to enact laws for the conservation and use of their waters by its citizens. Chief Justice Cureton, in writing the opinion, carefully noted the fact that the streams involved were "navigable in law," and in that connection said:

"Their beds were owned by the State; their riparian waters held in trust by the State for the benefit of its grantees whose lands touched their banks; and their flood waters were the property of the State, *'to be controlled and disposed of by the State for the best interest of all the people'*."

Thus it is apparent that statutory navigable streams in Texas are public streams, and that their beds and waters are owned by the State in trust for the benefit and best interests of all the people, and subject to use by the public for navigation, fishing and other lawful purposes, as fully and to the same extent that the beds and waters of streams navigable in fact are so owned and so held in trust and subject to such use.

■ The right to fish in public waters does not carry with it a right to cross or trespass upon privately owned land in order

to reach the water. Herrin v. Sutherland, 74 Mont., 587, 241 Pac., 328, 42 A. L. R., 937; Douglas v. Bergland, 216 Mich., 380, 185 N. W., 819, 20 A. L. R., 197; Farnham's Water and Water Rights, Vol. 1, pp. 661-662; 11 R. C. L., pp. 1033-1034. This conclusion is in principle supported by State v. Black Bros., 116 Texas, 615, 297 S. W., 213, 53 A. L. R., 1181, where it was held that the State was not entitled to a way of necessity across land privately owned to afford it and its oil and gas lessees a means of entering upon and developing a river bed owned by the State. It was contended that a reservation of a way of necessity should be implied on account of the unity of title in the sovereign when the grants of the land bordering the stream were made and because without such way of necessity there could be no complete use and enjoyment of the river bed retained by the State. The existence of such way of necessity was denied for the reason, among others, that it would be contrary to the general theory of the rights acquired by patentees of lands and guaranteed to private owners by the Constitution and would materially impair the value and usefulness of the lands to the owners without compensation.

■ The trial court correctly enjoined defendants in error from trespassing upon any of the land owned by plaintiff in error surrounding the waters of the lake while permitting them to go upon the lake from the public road which crosses the upper end of the lake on a low bridge.

■ Plaintiff in error insists that even if defendants in error should be accorded the right to fish in the waters of the lake above what was the bed of the river, they would in no event be entitled to fish in that part of the water above so much of the bed of the lake as is owned by plaintiff in error. This position is untenable, because the water of the lake, notwithstanding the fact that most of its bed is privately owned, is still public water. It is a part of the flood water of Medina River which the irrigation company has the right to impound and divert for irrigation. The permit acquired by the irrigation company carried with it the incidental right to construct and maintain the dam and the lake. It gave no title to the water, but only the right to divert and use so much of the water appropriated as might be necessarily required when beneficially used for the purpose for which it was appropriated. R. S., 1925, Articles 7467, 7468, 7473, 7476, 7492, 7515, and 7543; Motyl v. Boyd, 116 Texas, 82, 125-126, 286 S. W., 458.

It gave no title to the fish in the water of the lake, no exclusive right to take the fish from the lake, and no right to interfere with the public in their use of the river and its water for navigation, fishing and other lawful purposes further than interference necessarily resulted from the construction and maintenance of the dams and lakes in such manner as reasonably to accomplish the purpose of the appropriation.

When the irrigation company, plaintiff in error's predecessor in title, constructed the dam across the river, it caused by its voluntary act the flood waters of the river, public waters, to spread over the land which it had acquired, submerging and in effect destroying a portion of the river bed, and giving to the public waters a new bed. This artificial change in the river and its bed did not affect the public nature of the waters and did not take away the right of the public to use them for fishing. Douglas v. Bergland, 216 Mich., 380, 185 N. W., 819, 20 A. L. R., 197; Mendota Club v. Anderson, 101 Wis., 479, 78 N. W., 185; Pewaukee v. Savoy, 103 Wis., 271, 79 N. W., 436, 50 L. R. A., 836, 74 Am. St. Rep., 859; 27 R. C. L., p. 1205, Sec. 122.

Defendants in error Heath, Matthews and Self have assigned error to the action of the trial court and the Court of Civil Appeals in refusing to permit them "the right of reasonable use of the banks of the Medina River (and lake) in the exercise of their right of fishery in the waters thereof." They state that the solution of the question presented by their assignment of error depends upon the meaning of the word "streams" as used in Article 5302, arguing that the statute had the effect of reserving to the State the entire stream, including the banks as indispensable parts of the stream.

The statute does not in terms reserve to the State streams having a width of more than thirty feet. It simply declares such streams to be navigable and prohibits surveys from crossing them, with the result that such streams are made public and their beds are reserved to the State. The court, in City of Austin v. Hall, 93 Texas, 591, 597, 57 S. W., 564, when construing the statute and stating the result of the making of surveys and grants in accordance with its requirements, said:

"The grant of a tract of land upon the margin of a stream which retains an average width of thirty feet gives title to the water line of such stream, the title to the bed of the stream being reserved to the State."

Nothing is said in the opinion as to a reservation of the banks to the State, and nothing is said to define the line between public and private ownership along such streams except that it is at the water line.

In Motl v. Boyd, 116 Texas, 82, 109, 286 S. W., 458, however, the court deliberately adopted the same method for defining and marking the line between public and private ownership along the banks of a stream navigable according to the definition of the statute as was used by the Supreme Court of the United States in defining and marking the boundary line between Texas and Oklahoma. Oklahoma v. Texas, 260 U. S., 606, 67 L. Ed., 428, 261 U. S., 340, 67 L. Ed., 687, 43 Sup. Ct., 376. The Supreme Court of the United States, in its decree defining the boundary line between the two states and appointing commissioners to mark the line on the ground, thus described the south bank of the river and the boundary between the states:

"The south bank of the river is the water-washed and relatively permanent elevation or acclivity, commonly called a cut bank, along the southerly side of the river, which separates its bed from the adjacent upland, whether valley or hill, and usually serves to confine the waters within the bed, and to preserve the course of the river.

"The boundary between the two states is on and along that bank at the mean level attained by the waters of the river when they reach and wash the bank without overflowing it." 261 U. S., 340, 341-342, 67 L. Ed., 687, 688.

The line was still more definitely and practically described in the report of the commissioners, which was approved by the court, in the following language:

"The boundary line is a gradient of the flowing water in the river. It is located midway between the lower level of the flowing water that just reaches the cut bank, and the higher level of it that just does not overtop the cut bank." 265 U. S., 500, 501, 68 L. Ed., 1121, 44 Sup. Ct., 573.

Because of the State's ownership of the beds of statutory navigable streams and of their banks up to the line as above defined, the public may use their beds and their banks up to such line for fishing. Beyond that line, unless the rule of the civil law is applied, they have no right to go without the consent of the riparian landowner. Herrin v. Sutherland, 74 Mont., 587, 241 Pac., 328, 42 A. L. R., 937; Farnham on Water and Water Rights, Vol. 1, p. 659, 661-662; 11 R. C. L., p. 1033.

With reference to the civil law Farnham says: "By the civil law the public use of the banks of a river was part of the law of nations, just as that of the river itself." Farnham's Water and Water Rights, Vol. 1, p. 662. One of the laws of the Partidas provides:

"And although the banks of rivers are, so far as their ownership is concerned, the property of those whose lands include them, nevertheless, every man has a right to use them, by mooring his vessels to the trees, by repairing his ships and his sails upon them, and by landing his merchandise there; and fishermen have the right to deposit their fish and sell them, and dry their nets there, and to use said banks for every other purpose like these which appertain to the calling and the trade by which they live." Las Siete Partidas (C. C. H., 1931), Part III, Title XXVIII, Law VI, p. 821.

The civil law rule is, we think, more favorable to public ownership than is appropriate to our conditions, and there is no necessity for its application, in view of Article 5302 and the construction which has been given to that article.

The question under consideration is controlled, as far as inclosed land is concerned, by Article 1377 of the Penal Code (as amended by Acts of the 41st Legislature, 1st C. S., p. 242, Ch. 100, and 2nd C. S., p. 41, Ch. 26), which prohibits hunting or fishing upon the inclosed land of another without his consent and defines inclosed land as land which is inclosed by fence or partly by fence and partly by water or stream. This statute prohibits the public from using for fishing the banks of a stream above the line between public and private ownership where the banks are within inclosed premises as by it defined.

What has been said about the right of the public to use the banks of streams for fishing has, of course, no practical application to the banks of the Medina River, so long as they are submerged by the water of Diversion Lake. We find no authority for holding that the public have as an incident to the right to fish in Diversion Lake a right to use the banks of the lake, and it is our opinion that they have no such right. There are no banks of the lake, either superficially or geologically, comparable to the banks of a river. The water of the lake merely reaches land owned by plaintiff in error at an elevation varying with the quantity of water held in the reservoir. If it be said that the land bordering the water of the lake constitutes the banks of the lake, then where is the top of the banks, and what would mark the outer boundary

of the land that the public could use as banks for fishing? Furthermore, the use of plaintiff in error's fast land (that is, the land adjoining but not below the water of the lake) for fishing, without its consent, is prohibited by Article 1377 of the Penal Code above discussed, as that land is inclosed partly by fence and partly by the water of the lake.

It it is not necessary in this cause to decide, and we do not decide, whether the rights of the public to use the banks of streams in this State where they are bordered by grants made under Spanish or Mexican sovereignty are in any respect different from the rights of the public herein determined. (The grants which Diversion Lake touches were made by the State subsequent to 1840.) And no opinion is intended to be expressed as to what use may be made in emergency, or in other circumstances, of the banks of navigable streams by persons engaged in commercial navigation.

■ While the cause was pending in the Court of Civil Appeals plaintiff in error made application for and procured the issuance by the Board of Water Engineers of a permit to appropriate and use the water impounded in Diversion Lake "for the purpose of game preserve, recreation and pleasure resort." This permit was issued pursuant to Article 7470a, Revised Civil Statutes of 1925 (Acts, Reg. Sess., 39th Leg., Ch. 136, p. 341, Sec. 1), which provides that:

"The waters of the State may be appropriated as provided by law, in addition to the purposes and uses now provided by law, for the following purposes: Public parks, game preserves, recreation and pleasure resorts, power and water supply for industrial purposes and plants, and for domestic use."

These facts were brought to the attention of the court by written suggestion signed by defendants in error, to which was attached a certified copy of the permit issued by the Board of Water Engineers, and in which suggestion it was stated that plaintiff in error was claiming that the legal effect of the issuance and its ownership of such permit was to confer upon it the exclusive right to fish in Diversion Lake and to deprive defendants in error and other members of the public of their rights to fish therein, notwithstanding the judgments of the trial court and the Court of Civil Appeals. Counsel for plaintiff in error upon the oral argument of the cause stated in open court that should it be decided herein that plaintiff in error did not have the exclusive right to fish in Diversion

Lake, it would thereafter assert and insist upon its owner-ship of such right under the permit issued by the Board of Water Engineers. It becomes necessary to determine whether the issuance of the permit had the legal effect claimed by plaintiff in error, as it is apparent that if it did the questions involved herein and the cause are moot.

We do not find it necessary to decide whether an act of the legislature authorizing the granting to an individual or a corporation of an exclusive right to fish in a part of the water of a public stream belonging to the State for the use of all of its citizens would be violative of Section 3 of Article 1 of the Constitution of Texas, which guarantees equal rights and prohibits exclusive privileges, or of Section 26 of the same article, which forbids monopolies, for in our opinion neither the act of the legislature nor the permit issued by the Board of Water Engineers undertakes to confer such exclusive right upon the appropriator.

Article 7470a does nothing but name additional purposes for which the waters of the State may be appropriated, among such additional purposes being public parks, game preserves, recreation and pleasure resorts. The article is made a part of the chapter entitled "Use of State Water," by which the Board of Water Engineers is created and rules and regula-tions are prescribed for the appropriation and use of the waters of the State. Article 7467 provides that the waters of every flowing river or natural stream of the State "are hereby declared to be the property of the State, and the right to the use thereof may be acquired by appropriation in the manner and for the uses and purposes hereinafter provided, and may be taken or diverted from its natural channel for any of the purposes expressed in this chapter." Thus, upon compliance with the terms of the statute, the water of a public stream may be *used, taken* or *diverted* for game preserves and recre-ation and pleasure resorts. Authority is given by Article 7468 to hold and store the waters in lakes or reservoirs for the purposes for which they are appropriated, and by implication authority is given to create reservoirs by building dams across public streams. The chapter does not undertake to permit or prohibit or regulate the taking of fish from public streams or from reservoirs made by damming such streams.

If the exclusive right claimed by plaintiff in error in vir-tue of the permit exists, it must arise by implication from the mere granting of the right to appropriate and use the water of the river for game preserve, recreation or pleasure

resort. An intention on the part of the legislature to authorize the taking from the public of the right to use public waters for fishing and the conferring of the exclusive right to use such waters for that purpose upon one persons or corporation .is not to be inferred from the general language used in Article 7470a.

In Landry v. Robison, 110 Texas, 295, 298, 219 S. W., 819, the Court held that such general language as "other public lands," in the act of 1913 giving the Commissioner of the General Land Office authority to issue permits to prospect for oil and gas in lands owned by the State, did not include the soil beneath navigable waters (San Jacinto River, navigable within the meaning of Article 5302), and in so holding said:

"For, our decisions are unanimous in the declaration that by the principles of the civil and common law soil under navigable waters was treated as held by the state or nation in trust for the whole people. The trust impressed thereon withdraws such soil from the operation of general provisions like those of the Act of April 9, 1913, for the reason that nothing short of express and positive language can suffice to evidence the intention to grant exclusive private privileges or rights in that held for the common use and benefit."

A carefully considered opinion of the Supreme Court of Oregon (Hume v. Rogue River Packing Company, 51 Ore., 237, 92 Pac. 1065, 31 L. R. A. (N. S.) 396, 131 Am. St. Rep., 732) discusses in detail the respective rights of the public and riparian owners to fish in the navigable rivers of that state, and holds void as in violation of a constitutional guaranty of equal privileges and immunities a statute undertaking to grant to riparian owners along navigable rivers the exclusive right to fish. In its consideration of the proper construction to be given to grants of rights of fishery, the court said:

"Even where a mere right of fishery in public waters has been conferred by the sovereign, it will not be regarded as exclusive, in the absence of anything to indicate an intention to make it exclusive, although the title to the soil is also in the grantee."

See also: City of Galveston v. Menard, 23 Texas, 349, 397; Galveston City Surf Bathing Company v. Heidenheimer, 63 Texas, 559, 563; Gustafson v. State, 40 Texas Cr., 67, 48 S. W., 518, 43 L. R. A., 615; Humphreys-Mexia Company v. Arseneaux, 116 Texas, 603, 297 S. W., 225, 53 A. L. R., 1147; State

v. Bradford, 121 Texas, 515, 530, 50 S. W. (2d) 1065; Illinois Central R. Co. v. Illinois, 146 U. S., 387, 36 L. Ed., 1018, 1042, 13 Sup. Ct., 110.

The argument is made that an appropriation of water for a game preserve or pleasure resort would be an idle ceremony, and that private persons or corporations could not be expected to spend large sums of money to impound storm waters in rivers and create large reservoirs or lakes if the public, on the completion of such works, would have the same rights on the reservoirs as those who had spent their money to create them. This argument is relevant to the wisdom or value of a law authorizing the impounding of public waters in that method and for such purposes, but it does not justify reading into the statute the granting of an exclusive right. Furthermore, it cannot be said that so much of the statute which authorizes the appropriation of public waters for game preserves and pleasure resorts is wholly inoperative if an exclusive right of the character here claimed is not granted, for one may appropriate public water for such purposes and divert it to his land and impound and use it there to the exclusion of the public.

The construction sought to be given by plaintiff in error to Article 7470a and the legal effect claimed for the permit issued would be inconsistent and out of harmony with Article 4026, Revised Civil Statutes of 1925 (Acts, Reg. Sess., 39th Leg., Ch. 178, Sec. 7, p. 438) which was enacted by the same legislature that enacted Article 7470a, and which deals particularly with fish in public waters, the title to the beds of such waters, and the use of the waters and their beds for the taking and conservation of fish. It declares that the fish and the other aquatic animal life contained in the fresh waters, rivers, creeks, etc., of the State are the property of the people of the State, that all of the public rivers, bayous, lakes, etc., in the State, together with their beds, and all the products thereof, shall continue and remain the property of the State of Texas, and that in so far as the use of such waters and beds shall relate to the taking or conservation of fish, oysters, etc., they shall be under the control of the Game, Fish and Oyster Commissioner.

■ Since the permit issued to plaintiff in error by the Board of Water Enginers does not have the effect of giving it the exclusive right to fish in Diversion Lake, or of depriving the public of their right to fish therein, the cause is not moot.

The judgments of the trial court and the Court of Civil Appeals are affirmed.

Opinion adopted by the Supreme Court October 2, 1935.

Rehearing overruled October 30, 1935.