STATE v. BRYAN et al.
No. 9657.

Court of Civil Appeals of Texas. Austin.
Feb. 18, 1948.

Rehearing Denied March 10, 1948.

456

Price Daniel, Atty. Gen., Fagan Dickson, Ocie Speer, H. D. Pruett, Jr. and Ben H. Rice III, Asst. Attys. Gen., for appellant.

Fouts, Amerman & Moore, of Houston, and Crain, Vandenberge & Stoffer, of Victoria, for Mary Louise K. Bryan and Austin Y. Bryan, Jr., and others.

Wallace Hawkins, Earl A. Brown and Ross Madole, all of Dallas, and Vinson, Elkins, Weems & Francis and Thomas Fletcher, all of Houston, for Magnolia Petroleum Co.

## McCLENDON, Chief Justice.

Suit in trespass to try title by the State against Mrs. Bryan and others to recover about 5,000 acres of land in Calhoun County, known as the bed of Green Lake, and being the same land recovered by the State in Welder v. State, Tex.Civ.App. 196 S.W. 868 (error refused by three Justices of the Courts of Civil Appeals, designated and acting under Chap. 76, p. 142, Gen.Laws, Reg. Sess., 1917, 35th Leg., now Arts. 1748–1754, R.C.S.). In a trial to the court the State was denied recovery and it has appealed.

Appellees deraign their asserted title under a sale by the Land Commissioner to Elmer Yates, July 13, 1918, under an original application of Yates made in 1913, and a sale, after forfeiture, to Howard Kenyon (holder of the Yates title), January 12, 1928. It is the State's contention that the Welder judgment adjudicates and fixes the status of the area involved as the bed of a fresh water navigable lake and as not subject to sale; and that such decision is conclusive of all matters involved in this case in favor of the State: 1) under the doctrine of res judicata, because, a) "it is a *judgment in rem* thus binding on all persons," b) "it is a judgment and decision *affecting public interest* thus binding on all persons, whether parties or not," and c) "Elmer Yates, as purchaser from the State and having an interest in the subject matter became, in legal effect, a party to the suit by appearing and participating in the trial as an attorney of record"; and 2) under the doctrine of stare decisis, it being in effect a boundary suit.

Appellees contend (inter alia): 1) that the one year statute of repose and limitation (Art. 5329, Sec. 4, Vernon's Ann.Civ. St.) constituted, in any event, original authority in the Land Commissioner for the sale and resale of the area; validated these sales as to any original invalidity; and barred this suit by the State; and 2) the judgment in the suit (later discussed) in which the State recovered under the Relinquishment Act (Art. 5367 et seq., Vernon's Ann.Civ.St.) bonus money paid by the Humble under an oil lease executed by the holder of the Yates-Kenyon title operated as an estoppel against the State to assert the invalidity of that title. We sustain the first of these contentions. A decision of the second is thereby rendered unnecessary; but for which we would sustain it also.

The original briefs are quite lengthy (186 and 203 printed pages, respectively). They evidence a very able and thorough study and research as regards both the record and the authorities cited and elaborately quoted from and analyzed in support of their several contentions. While we have given them our careful study, we deem it necessary only to state what we regard as the salient facts which control our decision, and to discuss, as briefly as we may in the interest of clarity, the authorities which rule our conclusions. In some instances the controlling propositions have become elementary.

We think there can be no serious question but that the bed of Green Lake (regardless of its navigableness vel non) was a part of the public domain set aside to the permanent school fund. This appears from the tabulation that was made under Chap. XVI, p. 14, Gen.Laws, 26th Leg., 1899; and from the wording of the Settlement Act (Chap. XI, p. 29, 1st C.S. 26th Leg., 1900, now Art. 5416, R.S.C., Vernon's Ann.Civ.St. Art. 5416), passed pursuant to that computation, the pertinent portion of which Act reads:

"All lands heretofore set apart under the Constitution and laws of Texas, and all of

the unappropriated public domain remaining in the State, of whatever character and wheresoever located, including any lands [hereafter] recovered by the State, except that included in lakes, bays, and islands along the Gulf of Mexico within tidewater limits * * * is set apart and granted to the permanent school fund of the State."

The State contends that the bed of Green Lake did not pass to the public school fund, citing the following statutes and decisions:

The Act of 1905, Acts 29th Leg. c. 90, p. 128, reading:

"All of the public rivers, bayous, lagoons, lakes, bays and inlets in this State, and all that part of the Gulf of Mexico within the jurisdiction of this State, together with their beds and bottoms, and all of the products thereof shall be, continue and remain the property of the State of Texas except so far as their use shall be permitted by the laws of this State. So far as this use shall relate to the fish and oyster industry the State Fish and Oyster Commissioner shall have control thereof according to the authority vested in him by the fish and oyster laws of this State. It shall be the duty of the Fish and Oyster Commissioner to execute these laws and in their execution he shall have and exercise the powers given to sheriffs by the laws of this State."

The Act of 1911, Secs. 1 and 2 of Chap. 68, Acts 32nd Leg., p. 118. The pertinent portion of the caption of this Act reads: "An Act to provide for protection of the fish and oysters within tide water limits * * * and reserving fresh water lakes from sale * * *." The stated sections read:

"Section 1. All of the islands, reefs, bars, lakes and bays within tidewater limits from the most interior point seaward coextensive with the jurisdiction of this State and such of the fresh water lakes within the interior of this State as may not be embraced in any survey of private land, together with all the marl and sand of commercial value, and all the shells or mudshell, of whatsoever kind that may be in or upon any island, reef or bar, and in or upon the bottoms of any lake, bay or shallow water, and also all fishing waters, fish hatcheries and oyster beds, within the jurisdiction and territory herein defined, are included within the provisions of this Act, and all such islands, reefs, bars, lakes, bays, shallow waters, and the marl, sand, shells, or mudshell and oyster beds and fishing waters and fish hatcheries, located as herein defined, are, for the purpose of this Act, hereby placed under the management, control and protection of the Game, Fish and Oyster Commissioner.

"Sec. 2. Such of the fresh water lakes within this State as may not be embraced in any survey of private land shall not be sold, but shall remain open to the public; provided, should the Game, Fish and Oyster Commissioner stock them with fish, he is authorized to protect same for such time and under such rules as he may prescribe."

The cited Texas cases listed in the order of their citation follow: Sterrett v. Gibson, Tex.Civ.App., 168 S.W. 16; Welder case, above; Humble Pipe Line Co. v. State, Tex.Civ.App., 2 S.W.2d 1018, error refused; Diversion Lake Club v. Heath, Tex.Civ.App., 58 S.W.2d 566, Id., 126 Tex. 129, 86 S.W.2d 441; City of Galveston v. Mann, 135 Tex. 319, 143 S.W.2d 1028; State v. Bradford, 121 Tex. 515, 50 S.W.2d 1065; Goldsmith & Powell v. State, Tex. Civ.App., 159 S.W.2d 534, error refused; Ray v. State, Tex.Civ.App., 153 S.W.2d 660, error refused.

None of these cases adjudicates this specific issue. Any isolated expression in any of them which might otherwise be regarded as lending support to this contention must be construed with reference to its context, and in the light and setting of the particular issue before the court. As was said in Ferguson v. Johnson, Tex.Civ.App., 57 S.W.2d 372, 376, error dismissed C. J.: "The authority of a judicial *opinion* is limited to the judicial *decision*. It is what the court *decides* and not what the court *says* in so deciding which gives authority to the opinion. It is not a safe practice (but often an unfair one to the author) to isolate general expressions of view, and attempt to give to their apparent meaning in the abstract, a universal application." The Welder case will be discusssed later. The quoted Acts of 1905 and 1911 clearly, we think, were not intended in any way to delimit the effect of the Settlement Act as re-

gards the lands therein set aside to the public school fund. They should be so construed, in any event, in order to avoid any doubt as to their validity. See Gulf Union Oil Co. v. Isbell, Tex.Civ.App., 205 S.W.2d 105, and cited authorities. We are not here concerned with the beds of navigable streams, nor the regulatory power of the State regarding fish in whatsoever waters.

The record shows a uniform and unbroken practice by the several Land Commissioners, both before and after passage of the Acts of 1905 and 1911, supported by opinions from time to time of the Attorneys General, to sell as a part of the public school fund under school land statutes, the beds of fresh water lakes. It is not necessary to detail the evidence upon this point. It stands unchallanged in the record. Yates filed his application with the county surveyor for a survey April 26, 1913. The survey was made and filed in the Land Office in July 1913, the area being classified by the surveyor as alluvial soil, dry, subject to overflow, and its market value appraised at $5 per acre. Two days earlier the Commissioner wrote the Attorney General, stating:

"In Lavaca County there is a lake known as Green Lake. I understand it is now dry, and has been filed on as land. If this should be subject to sale at all, I beg to submit the question whether or not one person can buy more than two sections classed as agricultural, or whether they would be limited to only two sections if it were all classed as agricultural. Again, suppose there should be 1000 acres or more in the tract. Would that land be subject to sale without condition of settlement, or would settlement have to be required? If it should all be classed as grazing, there would be no doubt about ones right to buy as much as four sections, but could one buy more than two sections if it should all be classed agricultural?

"I would thank you to answer this as speedily as convenient. This will be filed on under Section 8 of the Act of 1905, found in the pamphlet land Act of 1905 with amendments of 1907."

The reply, dated July 24, 1913, was signed by Hon. G. B. Smedley, Assistant Attorney General (now Associate Justice of the Supreme Court) and approved by the department in executive session. Omitting the starred portions which discuss in detail the applicable statutes, the letter reads:

"In your letter to this department of July 21, you state that in Calhoun County a body of land, formerly the bed of Green Lake, is now dry and that this body of land contains more than One Thousand acres, and that application has been made, under Section 8 of the Act of 1905, to purchase this land. We have also been informed that the land is subject to overflow and that it has been classified as such by the County Surveyor of Calhoun County. You desire to know whether, if the land is classified as agricultural land, one person can purchase more than two sections, and you further desire to know whether the land is subject to sale without condition of settlement or subject to sale on condition of settlement.

\* \* \* \* \* \*

"Under our view of the law, in order to answer your two questions it is unnecessary to discuss within what class of land designated in Section 8 of the Act of 1905 the land in question comes, whether it is disclosed or undisclosed land or land subject to overflow, for in any event, it is subject to sale in unlimited quantities and without condition of settlement by reason of the change brought about by the law of 1907.

\* \* \* \* \* \*

"We, therefore, answer that if this land is subject to sale at all, an applicant to purchase the land would not be limited either to two sections, if it is agricultural land, or to four sections, if it is grazing land, and that the land is subject to sale without condition of settlement.

"As you have heretofore been advised, this Department is preparing to file suit against certain persons claiming this land adversely to the State and in our opinion on account of the decision of the Supreme Court in the case of The State of Texas v. The Dayton Lumber Company, it would be best that no award be made of this land until after the land is recovered for the State."

The last paragraph was evidently a reference to the Welder suit which was filed in the District Court of Travis County, June 2, 1914. Writ of error was refused, as stated, June 6, 1918. June 19, 1918, the Commissioner wrote the Attorney General:

"Relative to Green Lake in Calhoun County, beg to say that the area surveyed under each application calls for 5420 acres. You will recall that this was submitted to your Department on former occasions and we have an opinion from you of July 24, 1913, also another of October 7, 1915. Since these opinions have been rendered there have been some decisions of the courts concerning the amount of land one person can buy. Therefore some doubt comes in my mind as to whether one person can buy the entire 5420 acres, or whether one is qualified to buy a larger amount; also whether or not it will have to be sold on condition of settlement or without condition of settlement. Therefore, I would ask that you would advise this Department how much of this area, being all in one body, one person can buy and whether that purchase will have to be with or without condition of settlement. I would thank you for as early attention as the work in your Department will permit. The application was filed with the County Surveyor in 1913."

The reply, dated July 1, 1918, was also signed by Judge Smedley, and reads:

"As I understand your letter of June 29 to the Attorney General, you ask two questions:

"First. How much unsurveyed school land in Calhoun County can be purchased by one person under an application filed in 1913; and

"Second. Whether such land under such application can be purchased without condition of settlement.

"We advise you that both of these questions were answered in our opinion to you of July 24, 1913. We do not know of any recent decisions which call into question the correctness of that opinion."

After this correspondence Yates again took up with the Land Office the matter of his application, with the ultimate result that the application was granted and the sale made to him July 13, 1918. These negotiations are set out in much detail in the record. We note only the facts that Commissioner Robison, in person, went upon the land and, accompanied by Yates, made "a very thorough investigation on the ground." It was classified as "Min. & Graz." (Mineral and Grazing), and valued at $5 per acre. The total price was $27,100, of which Yates paid in cash $677.50 (1/40) and executed his note for $26,422.50. Later Kenyon acquired the Yates title; the sale was forfeited for nonpayment of interest October 17, 1927, under Ch. 94, Laws 39th Leg., as amended by Ch. 25, 1st C.S., Laws 39th Leg., Vernon's Ann.Civ.St. Art. 5326a; the land was revalued and resold to Kenyon January 12, 1928, at $5 per acre, he paying cash (1/40) and executing his note in the same amount as had Yates.

Upon the trial the only evidence offered by the State regarding the character of the land was that embodied in the judgment and other proceedings in the Welder case, under the theory above stated. The findings of fact upon this issue are set out in the opinion of this court in 196 S.W. at page 869. The statement of facts on appeal was excluded, and we think properly so, since the findings of fact set forth in the opinion constitute the basis upon which the conclusions of the opinion were rested.

Appellees' evidence upon this issue, epitomized from the unchallenged statement in their brief, was: About 1895 the bed of Green Lake was "bone dry", was filled up with "Seeney" (Seenie) beans, small ash and willow trees, vegetation growing on and around the banks, and tie vines growing in the bed of the "lake", five or six feet high, so that it had no appearance of a lake. Again in 1900 it was bone dry. Between 1900 and 1912 it was from time to time filled up with rains and floods of the Guadalupe River, its source of water; the floods putting water therein from two to six feet deep. Sometimes it would overflow; but would evaporate quickly. It would take a big rise in the river to put water in it to any extent. Steam tractors were used to plow in the

area. Cotton was raised therein around 1912 and 1914. It had no water inlet or outlet. The bed got very low the latter part of 1916, was completely dry during 1917 and 1918, and was overflowed by heavy rains in the 1919 hurricane. Between the dry periods of 1896 to 1900, 1912, 1916 and 1918, water in the area would vary from an occasional six feet when full to two feet, but the bed would be dry again within a year. Between 1896 and 1918 the bed area was dry as much as it had water. The lake had no piers or wharves, no commerce was ever carried on upon it; and no boat upon it would have had an outlet. No towns were on its banks,—the nearest being Green Lake, a settlement of only a few houses about half mile away, and distant from the nearest town some ten miles. This evidence relates to conditions prior to 1930 when some changes were wrought by highway construction. These changes are unimportant as rights under the two awards and sales were fixed prior to that year.

The facts of this case clearly bring it within the holding in Caples v. Cole, 129 Tex. 370, 102 S.W.2d 173, 104 S.W.2d 3, to the effect that where a sale of school land is made by the Commissioner, if authorized by law or "made under color of law," it is unimpeachable after one year under the provision of Sec. 4, of Art. 5329, Vernon's Ann.Civ.St., reading: "No sale made without condition of settlement shall be questioned by the State or any person after one year from the date of such sale." The case there was one in which the land admittedly lay within five miles of a producing oil well, and the contention was made that the sale was void under the proviso of Sec. 2 of Art. 5421c, Vernon's Ann.Civ.St., that "all such land within five miles of a well producing oil or gas in commercial quantities shall be subject to lease only, and the surface rights shall not be sold." It was held that even admitting that the land was within five miles of a producing well it was made under "color of law," and the one year statute of limitation applied. The case here is even stronger than that presented in the Cole case. There certainly was a fact question at least as to whether the area was the bed of a navigable, a non-navigable lake, or merely overflow land. Even under the factual situation detailed in the Welder opinion, the conclusion therefrom that the lake was navigable was, to say the least, questionable. The conclusion reached is, we think, clearly in conflict with that reached in Taylor Fishing Club v. Hammett, Tex.Civ.App., 88 S.W.2d 127, error dismissed, C. J. (Alexander, then Associate Justice of the Waco court, writing). But, independently of the correctness of this holding in the Welder case (and assuming for the nonce its non-binding effect here), there was ample "color of law" to support the Commissioner's action. Aside from the physical facts shown by the evidence (and we must view them most favorably in support of the judgment) and those found by the Commissioner from his personal inspection of the area, the correspondence between the Commissioner and the Attorney General in 1913 and in 1918, is, in our opinion, susceptible of no other reasonable conclusion than that the latter regarded a sale by the former as valid. It must be borne in mind that the Commissioner was seeking legal advice as a basis for his action in connection with the State's business which it was his legal duty to conduct, from the official whose legal duty it was to give such advice. The subject matter, the salability of the bed of Green Lake, was specifically pointed out in the correspondence; the State's title to that bed was the subject matter of the Welder suit. If, in the view of the Attorney General, there was anything in the adjudication in that case which would deny the power of sale to the Commissioner, it certainly would have been pointed out to the latter. The same able Assistant Attorney General conducted the correspondence both before and after the Welder suit, and also appeared as attorney of record for the State in that suit. We hold that the sale was made, in any event, under color of law, and the suit of the State was barred under the stated one year statute of limitation, unless the State's contention regarding the effect of the Welder decision should be sustained, a question we now discuss.

The Welder suit was a simple action of trespass to try title brought by the State to recover the area comprising the bed of Green Lake from holders of grants bordering on the Lake whose field notes called for the borders of the Lake delineated by metes and bounds. The defendants contended that their respective grants extended by operation of law to the center of the Lake. A mere glance at the map on page 869 of 196 S.W. demonstrates the impossibility of extending these lines under this theory upon any legal or equitable basis. The record showed that each survey bordering on the Lake had its full quota of land under its field notes, without encroaching upon the bed of the Lake. The trial court's findings of fact detailed the physical conditions regarding the area and concluded that it was an inland non-navigable fresh water lake. "The State recovered all of the bed of the lake not included in the field notes of surrounding surveys when run out according to their calls for course and distance." [196 S.W 868.] At the outset the opinion upon affirmance of this judgment states:

"The issue in ·this case is not whether the state could grant title to land in the bed of a natural, permanent fresh water lake, but has it done so as to Green Lake? If so it is solely by reason of the fact that it has granted all of the land contiguous to and bordering upon said lake, and not by reason of any description in the grant which otherwise covers the bed of the lake. Neither is it a question of appurtenance, or riparian rights. If the appellants are the owners of the land covered by Green Lake, it is because such land has been granted to them, and not because it is appurtenant to land which they own. Land cannot be appurtenant to land. As to riparian rights, the judgment of the trial court expressly reserves such rights to appellants. The appellants plant themselves upon the doctrine of the common law—that a conveyance of land on a non-navigable stream conveys title to the center of such stream, their contention being that the common law in this regard is modified by statute in this state only to the extent of declaring streams 30 feet wide or over to be navigable."

The opinion then discusses the common law of England with reference to grants upon the borders of non-navigable streams (in English law no streams were navigable above tide water) and applies that doctrine to Texas streams having less than the statutory 30 feet width, and holds that such grants do extend to the thread of the stream. But (the opinion queries) "Does the common-law doctrine as to a non-navigable stream apply in England also to lakes?" Then ensued a discussion of pertinent English cases, and the conclusion was reached that the query should be answered in the negative. A discussion of the authorities upon the subject in this country is then given, followed by a discussion of authorities upon the subject of the tests of navigability of fresh water lakes. The final conclusion upon these subjects is thus stated:

"The 'reasonable rule' referred to is that the law as to extending calls for non-navigable streams to the center thereof does not apply to lakes, a rule which we approve, but we also think it a reasonable rule that lakes large enough to be useful to the public for boating and fishing should be held to be public and not private property."

The concluding paragraph reads:

"Under the law as it now exists in this state, Green Lake cannot be sold (R.S. art. 3980), but is under the jurisdiction of the game, fish, and oyster commissioner (article 4021b)."

The statutory references are to the above quoted Acts of 1905 and 1911, respectively.

Opinion on rehearing reads:

"Appellants in their motion for a rehearing assert that we overruled the findings of fact made by the trial court as to the navigability of Green Lake. In this appellants are mistaken. The trial court found certain facts as to the size and depth of the lake, and the purposes for which it had been and probably would be used, and from these facts deduced as a matter of law that Green Lake was not navigable. We accept these facts and deduce the opposite legal conclusion. However, as appears from our opinion herein, we would have affirmed the· judgment of the trial

court upon other grounds without reference to whether or not Green Lake is navigable."

As stated the application for writ of error was refused by Justices of the Courts of Civil Appeals, under Arts. 1748–1754, which provide (Art. 1750): "The refusal or dismissal of any application shall not be regarded as a precedent or authority."

In so far as the suit may be regarded as one of boundary it is not necessary to resort to the doctrine of stare decisis, as the judgment fixed the boundary between the State and the defendants, all of whom were bound by that judgment. In other respects we are unable to see in what way the doctrine of stare decisis can have any application whatsoever.

As regards the issue of res judicata: We are clear in the view that the only effect of the judgment was to adjudicate the title to area involved. It was a judgment in rem only to the extent that it fixed the status of the title to the area as between the parties to the suit. It clearly did not adjudicate the rights of anyone not a party to the suit or one privy to such party. Had there been an outstanding grant to the area held by one not a party to the suit, the validity of his grant and his rights thereunder would have been affected in no way by the judgment. Nor do we think the judgment in any way affected the status of the area as regards the State's subsequent power to dispose of it under then existing laws. Yates had no claim adverse to the State. While we may assume that he would have been estopped from afterwards asserting such adverse claim, as for example if he held under a prior grant to the area, his right to become a purchaser from the State was not impaired. Any one of the defendants in that suit would have had the same right, and a subsequent sale to him by the State would have been as effective as if he had not been a party to the suit. Much has been written upon the subject of judgments in rem and quasi in rem. Title to real property is subject to the jurisdiction of the state in which it is located regardless of its individual ownership, or of the place where the owner resides or may be found. This title, regarded as a res, may be adjudicated under appropriate state procedure. Such a judgment is binding upon those properly before the court under such procedure, and to that extent determines the status of the res and is a judgment in rem. There are many kinds of suits that may be classed as in rem or quasi in rem. It is not necessary to discuss them here. The ordinary suit in trespass to try title is one of them only to the extent that it adjudicates the status of the title to the land involved as between the parties to the suit and their privies. These principles we think are elementary, and we deem it unnecessary to discuss the various authorities which the State cites in support of its contentions.

We think it is wholly immaterial, in so far as affects the character of the judgment, upon what theory the State recovered. As a matter of fact it recovered upon the theory that the land was not embraced within any of the grants held by defendants. The area was clearly not within the boundaries delineated in the grants. Defendants defended upon the ground that the area was a non-navigable fresh water lake, to the center of which their boundaries were extended under the English common law doctrine regarding grants bordering on non-navigable streams. The State disputed the applicability of this doctrine to non-navigable lakes, but further countered (we will assume) that the Lake was in fact navigable. The trial court held the Lake non-navigable, but concluded, nevertheless, that the grants did not extend beyond their field note calls. The appellate court approved this conclusion, but further held the Lake to be navigable in fact (under a theory disapproved in Taylor v. Hammett, above). Upon rehearing it held, in effect, that the issue of navigability was immaterial as "we would have affirmed the judgment * * * upon other grounds without reference to whether or not Green Lake is navigable." This demonstrates that the only status adjudicated was that of title to the area as between the parties. Navigability vel non was only incidental, and as expressly held of no controlling effect.

464

We cannot regard the judgment as fixing the status of the area in any respect as affecting the power of subsequent sale under existing laws. But even so, we hold that the sales to Yates and Kenyon were made under color of law as that term is used in Caples v. Cole, and that under the factual situation already detailed the rights of the State to impeach those sales are barred by the cited one year statute of limitation.

While this holding controls our decision, we give briefly the facts regarding the suit of State v. Humble, referred to in the second paragraph above. From time to time Kenyon and his grantees executed oil and gas leases upon the land under the Relinquishment Act, the State collecting large sums as its share of the rentals, the entire bonus money being paid to and retained by the lessor. There was no production under any of these leases. Among them was one in favor of the Humble which was later released. After the final decision in the Empire case (Empire Gas & Fuel Co. v. State, 121 Tex. 138, 47 S.W.2d 265), the State notified all lessees and lessors of that decision and demanded payment of its half of the bonus money. Payments were voluntarily made in several cases, but not by the Humble; and on August 30, 1938, the Attorney General brought suit in the name of the State against it for one-half of the bonus money it had paid to the lessor for the lease. That suit was predicated upon the allegations (substantially stated) that the land was a part of the public school fund, that the surface had been legally sold under valid mineral classification, and that the lease had been made by the surface owner as agent for the State under the Relinquishment Act. The suit was contested and the State recovered $2,168. The judgment was paid by the Humble. Here the State acted through its duly authorized agency (the Attorney General), and: "It is well settled that when the State makes itself a party to an action * * * in its proprietary capacity, it is subject to the law of estoppel, as other parties litigant * * *." 49 Am.Jur., § 85, p. 298. See also Anderson, Clayton & Co. v. State,

122 Tex. 530, 62 S.W.2d 107. As such litigant the State was not exercising its powers of sovereignty. The recovery in that case was based only upon the asserted validity of the sales to Yates and Kenyon. If those sales were invalid there could have been no recovery by the State. In our opinion the State was clearly bound by that judgment. It is unimportant that only the Humble (and not the lessor) was a party to that suit.

A subsequent lease was made to the Magnolia (the details of which need not here be noted) with the approval of the School Land Board, the Land Commissioner, and the Attorney General, under which the State received its share of the bonus and lease money under the Relinquishment Act. Altogether the State has received under these sales and leases over $60,000 for the benefit of the public school fund. The validity of these sales and leases was not brought in question until the filing of this suit on June 11, 1945.

The trial court's judgment is affirmed.

Affirmed.

On Appellants' Motion for Rehearing

Of the 58 assignments of error in the motion the 25th reads:

"The Court erred in holding that 'color of law' was given to the purported sale of Green Lake by the correspondence between the Land Commissioner and the Attorney General in 1913 and 1918, since such correspondence reveals that the Land Commissioner did not ask or want the advice of the Attorney General on the legality of the sale of Green Lake qua lake; and that the Attorney General was careful not to make any statement on such question to the Land Commissioner; and the records of the Attorney General's office, public in nature, reveal that such office by letter dated July 29, 1918, attached hereto as Exhibit 'A', advised the firm of Proctor, Vandenberg, Crain & Mitchell, predecessors to Crain, Vandenberg & Stoffer, attorneys herein, that the purported sale of Green Lake was made without the advice and approval of the Attorney General; and the State's

brief in the Welder case, a record of this Court, shows that the Attorney General did not subscribe to the view that lakes could be sold."

This letter, copied in full in an appendix hereto, was in reply to one dated July 27, 1918, addressed to Judge Smedley, as Assistant Attorney General, in which the sale to Yates was referred to, attention being called to the position taken by the Attorney General's Department in the Welder case. We quote the last three paragraphs of the letter:

"Of course we do not mean to intrude upon you any ideas as to what the Attorney General's Department should take in matter of this sale, but we are quite sure that the sale of this property was not with the sanction or approval of the Attorney General's Department.

"If you feel that you can, with propriety, write us regarding this matter, we would appreciate any communication from you.

"It is currently stated through this section, that the intention of these people, present claimants of the lake, is to put a levee around the same, and, of course, obstruct and interfere with the riparian rights recognized in the defendants in this case of the State of Texas against Welder et al."

Judge Smedley's letter of July 29, 1918, does clarify the point that the Department was not giving any opinion upon the salability of Green Lake. It also makes clear the position of the Department regarding action of the Land Commissioner in making the sale, that is, that the issue whether there had been such change in the bed of the lake as to make it "permanently dry was one of fact to be determined by him." This clearly was an assertion in effect that the action of the Commissioner in classifying the area was not reviewable by the Department, and his action in making the sale was conclusive so far as the Department was concerned. The statement "Under the circumstances, we do not know of any action that this Department should take with reference to the sale of the bed of Green Lake," could not mean other than that the Department regarded the action of the

Commissioner in making the classification and sale as within the purview of his delegated duties. We do not see how the State can derive any comfort from this letter, in its interpretation of the Welder decision as permanently fixing the status of Green Lake as navigable, and therefore as never thereafter subject to sale, regardless of changes in conditions. There has been no subsequent change in the duties of the Department to protect the interests of the State in the sale of its public lands. It was the same in 1918 as it was in 1946. Consciousness of this duty is implicit in the July 29, 1918, letter. We do not pass upon the question whether we are required to take judicial knowledge of this letter. We only hold that there is nothing in its contents which (if admissible at this stage of the proceeding) casts any doubt upon our holdings upon the controlling issues in the case. Rather those holdings are strengthened.

We did not hold (as the motion asserts) that the beds of navigable fresh water lakes were not withdrawn from sale under the Acts of 1905 and 1911.

The motion is overruled.

APPENDIX

"July 29, 1918.

"Proctor, Vendenberge, Crain & Mitchell

"Victoria, Texas.

"Gentlemen:

"I have carefully read your letter of July 27th with reference to Green Lake.

"It is of course true that the suit by the State, in which was involved the title to the bed of Green Lake, was tried on the theory that Green Lake was a permanent lake and that the evidence introduced in the trial of the case showed that it was a permanent lake and had been dry but twice within the memory of living witnesses. If Green Lake is a permanent lake, its bed of course is not unsurveyed school land and is not subject to sale as such.

"The Commissioner of the General Land Office has never requested the Attorney General to advise him whether he had the authority to sell the bed of Green Lake. Some months ago, and before the suit was finally disposed of, in a conversation with

466

the Commissioner, I told him that the case was tried on the theory that Green Lake was a permanent lake, and that the evidence showed that it was. It is my recollection that he told me at the time that certain persons interested in the applications to purchase were taking the position that conditions had changed since the case was tried and that the bed of the lake was permanently dry, and that I told him then that the question whether there had been such change and whether the bed of Green Lake had become permanently dry was one of fact, to be determined by him, I am not entirely sure that I made such statement to the Commissioner, but I have made it to persons who have made inquiry as to Green Lake.

"A short time ago, the Commissioner wrote a letter to the Attorney General referring to an opinion of this Department written July 24, 1913, with reference to the quantity of unsurveyed land that could be purchased by one person in Calhoun County, and desired to know whether recent decisions of the courts had changed the rule announced in that opinion. He was advised that the recent decisions of the courts did not affect that opinion. His letter referred to Green Lake, but the question asked was only as above indicated and related to the matter of quantity and the matter of settlement only, and no advice was requested and none was given as to his authority to sell Green Lake. The Commissioner has a rule that he will not follow the opinions of this department unless they are given in direct response to questions asked by him, and on that account we are always careful to confine our opinions to his questions.

"Under the circumstances, we do not know of any action that this Department should take with reference to the sale of the bed of Green Lake. You are correct in your assumption that the sale was made without the advice and without the approval of this department. Neither did this department disapprove the sale. It was not consulted about it.

"With best wishes, I am

. "Yours very truly,".