# IN THE SUPREME COURT OF TEXAS

═══════════════

No. 18-0264

═══════════════

GEORGE P. BUSH, AS THE LAND COMMISSIONER OF THE TEXAS GENERAL LAND
OFFICE, PETITIONER,

V.

LONE OAK CLUB, LLC, RESPONDENT

═══════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

═══════════════════════════════

**Argued September 19, 2019**

JUSTICE BUSBY delivered the opinion of the Court, in which JUSTICE GUZMAN, JUSTICE
LEHRMANN, JUSTICE BOYD, JUSTICE DEVINE, and JUSTICE BLACKLOCK joined.

JUSTICE GREEN filed a dissenting opinion, in which CHIEF JUSTICE HECHT joined.

JUSTICE BLAND did not participate in the decision.

This case is a title dispute between the State and a private landowner over portions of the

submerged bed of Lone Oak Bayou, a navigable body of water located near the Gulf of Mexico.

The owner's predecessor bought 160 acres of land from the State that included the bayou's bed,

and the Legislature later passed a statute—the Small Bill—validating conveyances that included

"the beds . . . of watercourses or navigable streams." The Commissioner of the General Land

Office contends this statute did not validate the owner's title to the bayou's bed because the term

"navigable stream" refers only to portions of the stream not subject to the ebb and flow of the tide, and the tide enters the bayou.

We disagree with the Commissioner and conclude that the Legislature gave all buyers of submerged streambeds what they paid for. From the early days of the Republic of Texas, the term navigable stream has been defined without drawing a distinction based on the tide: it includes portions of the stream both above and below the tide line. The government holds title to the beds of navigable streams in trust for the public, and the Legislature can convey those beds to private owners. It did so expressly in the Small Bill.

We agree with our dissenting colleagues that there are key differences in the legal rules governing ownership of submerged land above and below the tide line. All agree on how those rules apply here: the State owns the beds of navigable streams on both sides of the line. The only issue in dispute is what land was included when the Legislature chose to validate certain conveyances of state-owned "beds . . . [of] navigable streams." Because the plain and settled meaning of the statutory term "navigable stream"—under both the civil and the common law— includes portions of the stream below the tide line, the beds underlying those portions were properly conveyed.

The Commissioner also asserts that Lone Oak Bayou is not a navigable stream for reasons apart from the tide, so the Small Bill does not apply in any event. We conclude there are factual disputes to be resolved regarding whether the bayou is a navigable stream within the scope of the statutory conveyance. We therefore reverse the summary judgment in favor of the owner and remand for further proceedings.

2

## BACKGROUND

The Lone Oak Club owns an approximately 160-acre tract in Chambers County that includes land submerged under the Lone Oak Bayou.[1] The bayou is an inlet; its mouth is located in the survey's northwest corner, near Trinity Bay. Due east of the tract are the bayou's headwaters, from which rainwater runoff drains along the bayou's length, through a narrow and winding passage, and into the bay. The parties agree that the bayou is navigable and its waters are "tidally influenced"—an imprecise term not recognized in Texas property law that the parties use to describe waters below the line of mean high tide.

The tract was patented in 1872 to Sophronia Barrow, who purchased it from the Governor of Texas. The patent to Barrow describes, crosses, and includes Lone Oak Bayou. Barrow paid for 160 acres of land, and it is undisputed that the patent only contains that much land if it includes a portion of the bayou's bed. Specifically, the patent—also known as the "Barrow Survey"—grants

> to Sophronia Barrow, her heirs and assigns Forever, One hundred and Sixty (160) acres of Land situated and described as follows In Chambers County on the East side of Galveston Bay about 15 miles S. 8° E. from the town of Wallisville by virtue of her affidavit before the District Clerk in and for said County dated Dec. 20, 1871 in accordance with the provisions of an Act aff'd March 24, 1871. Beginning on the S. bdy line of J. S. Roberts Lea. sur 1330 vs E. of his S.W. corner. Thence S. at 455 vs edge of Marsh 950 vs cor. in said marsh. Thence W. 950 vs Corner a post. Thence N. 950 vs corner Stake on the N. side of s'd Bayou. Thence E. with s'd Roberts line at 95 vs Orr's Bayou [now also known as Lone Oak Bayou] 12 vs wide runs S. W. 230 vs Same Bayou runs N. W. 850 vs to the Beginning.[2]

---

[1] Lone Oak Bayou is also known as Orr's Bayou or Orr's Creek.

[2] The notation "vs" is shorthand for "varas," a Spanish unit of length used in Mexico and early Texas. *See* TEX. AGRIC. CODE § 13.022(c); *State v. City of Victoria*, 309 S.W.2d 288, 291–92 (Tex. App.—Fort Worth 1958, writ ref'd n.r.e.).

3

Through a regular chain of title, the Club acquired the Barrow Survey in 2002[3] to establish a recreational area for hunting and fishing, and it has consistently used the property for that purpose.

The dispute in this case arose when members of the public began hunting and fishing in portions of the bayou within the Barrow Survey. Although the Club takes no issue with the public accessing water in the bayou, as it concedes the State holds title to the water, sand, and gravel in public trust, the Club contests the public's right to come into contact with the bayou's submerged bed. Because the Barrow Survey includes the land under the bayou's water, the Club contends, trespass occurs when individuals set foot on or cause shotgun pellets to contact the bayou's bed.

The General Land Office (GLO)[4] became involved in this dispute in late 2008, when an evicted hunter asked for its opinion on the "extent of State ownership in Lone Oak Bayou and the attendant waterways and their beds adjacent to and flowing through" the Club's property. In March 2009, two GLO staff members conducted an on-site visual inspection and "observed the tide coming in and rising" on the bayou and its connected lakes. The director of the surveying division subsequently rendered an opinion that the disputed areas are "State owned submerged lands," the "waters are tidally influenced, public, waterways," and the "boundary between the State and private ownership is the line of [mean high water]." After meeting with GLO staff, the Club received a letter reflecting the agency's official opinion on the matter.

In this letter, the GLO asserted State ownership of "any part of Lone Oak Bayou and the attendant waterways . . . which are located below the line of mean high water." In support of this

---

[3] The Club's chain of title is undisputed. The patent to the Barrow Survey has never been challenged, cancelled, or forfeited.

[4] The GLO is a constitutionally created agency empowered to supervise and manage state-owned lands. TEX. CONST. art. XIV, § 1.

conclusion, the GLO explained that due to the bayou's "tidal influence," its submerged lands were never properly conveyed from State ownership:

> While conducting the inspection of your property, staff observed that Lone Oak Bayou and the attendant waterways adjacent to and flowing through the property are tidally influenced. It is fundamental Texas law that tidally influenced waterways and their beds are owned by the sovereign, and have been so even before Texas was a State. These waterways and the beds beneath them remain the property of the State . . ., unless a clear and specific conveyance by the legislature changes the ownership.

The parties agree that the bayou's waters are "tidally influenced" and that the 1872 conveyance of the bayou's submerged lands was initially invalid, though they give different reasons for this opinion.[5] The crux of the parties' dispute is whether a subsequent "legislative conveyance," the 1929 Small Bill, validated the portion of the 1872 patent covering submerged lands under "tidally influenced" waters.

The Small Bill provides, in short, that "[a]ll patents to and awards of lands lying across or partly across water courses or navigable streams and all patents and awards covering or including the beds or abandoned beds of water courses or navigable streams or parts thereof . . . are hereby confirmed and validated" if they meet certain other conditions. TEX. REV. CIV. STAT. art. 5414a(1) (1929). The State of Texas "relinquishes, quit-claims[,] and grants to patentees and awardees and their assignees" such patents and awards. *Id.* art. 5414a(2).

In its letter to the Club, the GLO maintained that the Small Bill did not validate patents to submerged lands underlying "tidally influenced waterways." Specifically, the GLO stated:

> Staff could find no evidence of a legislative conveyance of the waterways adjacent to and flowing through your property. We understand that you believe the Small

---

[5] The dissent concludes that this conveyance of submerged land was invalid because the Governor, not the Legislature, issued the patent. *Post* at __ (Green, J., dissenting). Because we hold that the Legislature later validated the conveyance in the Small Bill, we do not address this issue.

5

> Bill . . . applies to the navigable waterways flowing through your property and that the beds of the navigable waterways therefore belong to the upland owner. The GLO, however, has always held to the opinion that the Small Bill does not apply to tidally influenced waterways.

The GLO has maintained this position throughout the litigation.

The Club disagreed. Believing the Small Bill covered submerged land under tidally influenced navigable streams and water courses, the Club petitioned the GLO to change its stance. When these efforts proved unsuccessful, the Club brought an *ultra vires* trespass-to-try-title suit against the GLO Commissioner.[6] In its petition, the Club alleged: the GLO had no right to cloud its title to the land; the Club was the rightful owner of all 160 acres within the Barrow Survey, including land submerged under Lone Oak Bayou; and the State had no right to permit members of the public to set foot on that land. Both parties moved for summary judgment.

The Club argued, as it does here, that the plain and unambiguous language of the Small Bill applies to lands submerged beneath tidally influenced navigable streams and watercourses. The Club argued that as a patent crossing a "water course" or "navigable stream," the Barrow Survey fit the Small Bill's requirements. The Small Bill thus validated the patent and—being necessary to reach the intended acreage—all of the submerged beds within its boundaries. The Commissioner's motion echoed the GLO letter, arguing the Small Bill conveyed only submerged beds underlying non-tidally influenced streams.

The trial court denied the Commissioner's motion and granted summary judgment for the Club. Concluding that the Small Bill validated patents to and awards of submerged beds

---

[6] The parties argued about the propriety of this *ultra vires* action in the courts below. They have not raised the issue in this Court.

underlying tidally influenced water courses and navigable streams, the trial court held that the Club owned the bayou's beds within the Barrow Survey in fee simple. The Commissioner appealed.

In the court of appeals, the Commissioner again argued that the Small Bill did not convey title to land submerged under tidally influenced water.[7] 546 S.W.3d 766, 777–78 (Tex. App.—Houston [1st Dist.] 2018). The court of appeals disagreed, holding the plain language of the Small Bill and its "historical purpose" indicate "the term 'watercourse or navigable stream' as used in the Small Bill does not exclude watercourses or navigable streams that are 'tidally affected.'" *Id.* at 779. Because the Barrow Survey met the Small Bill's criteria for validation, the court of appeals affirmed the trial court's summary judgment in favor of the Club. *Id.* We granted the Commissioner's petition for review.

## ANALYSIS

In this Court, the parties continue to dispute whether the Small Bill validated patents of land submerged under tidally influenced water courses and navigable streams. The Commissioner argues it did not; the Club contends it did. Before diving into the analysis, we address a few preliminary matters.

First, recognizing that courts' decisions have not always been clear in this area, we begin by explaining the terms we use in this opinion. The Small Bill addresses "navigable streams" and "water courses," while the 1837 Navigable Stream Statute, which we also discuss, uses the terms "navigable water course," "stream," and "navigable stream." For ease of reference, we use the term "navigable stream" when referring generally to all three bodies of water just mentioned,

---

[7] The Commissioner also argued the Club's *ultra vires* trespass-to-try-title claim was improper. 546 S.W.3d at 772–75. The court of appeals rejected this argument, *id.* at 775, and the Commissioner has not sought our review of the issue.

though these bodies could encompass different areas depending on the geographic features present. *See State v. Bradford*, 50 S.W.2d 1065, 1072 (Tex. 1932).

Second, "tidal influence" is an imprecise term not recognized in Texas law. Generally, in determining the boundary between State and private ownership of land along the seashore, Texas looks to the relevant tide line in effect at the time of the grant in question. For grants under the Mexican civil law, applied in Texas until January 1840, the higher high tide line determines State and private boundaries. *Luttes v. State*, 324 S.W.2d 167, 191 (Tex. 1958). For grants under the English common law, applied from January 1840 onward, we look to the line of mean high tide. *Id.* State ownership generally begins below the relevant tide line. *Heard v. Town of Refugio*, 103 S.W.2d 728, 733 (Tex. 1937). The Barrow Survey was patented in 1872, so the applicable line here is that of mean high tide. *Luttes*, 324 S.W.2d at 191.

As we shall explain, however, the tide line does not establish the dividing line between State and private ownership of land under navigable streams that adjoin the sea. Rather, the State holds title to the land under such streams both above and below the tide line in trust for the public. *See Bradford*, 50 S.W.2d at 1070 ("If it be determined that the river is navigable, then the title to the land in the river bed belongs to the state . . . ."). Texas law permits the Legislature to convey public land under both streams and the sea so long as the conveyance meets certain requirements. *Id.* at 1076; *Coastal Indus. Water Auth. v. York*, 532 S.W.2d 949, 951 (Tex. 1976) (noting the Legislature granted the City of Houston the bed of the Houston Ship Channel, a navigable stream partially below the tide line).

These considerations help us frame the issue presented more precisely. As we have explained, the Small Bill "confirmed and validated" "patents to and awards of lands" that include

the "beds [of] . . . navigable streams." The parties agree that this language conveyed the submerged beds of navigable streams above the tide line, but they dispute whether it had the same effect below the line. Thus, the issue we must decide is: under the Small Bill, does a "navigable stream" exist only above the tide line? In other words, does a navigable stream no longer bear that name below the tide line, such that the Small Bill does not validate a conveyance of its bed?

Because the Small Bill was enacted to cure title defects caused by the 1837 Navigable Stream Statute, we conclude the meaning of navigable stream in each statute must be the same. Under the Mexican civil law, in effect when the Navigable Stream Statute was passed, the term navigable stream encompassed portions of the stream above as well as below the tide line. We therefore agree with the trial court and court of appeals that the Small Bill validates patents conveying the submerged beds of navigable streams, whether above or below the tide line.

## I. Standard of review

"We review summary judgments de novo, taking as true all evidence favorable to the nonmovant, and indulging every reasonable inference and resolving any doubts in the nonmovant's favor." *Barbara Techs. Corp. v. State Farm Lloyds*, 589 S.W.3d 806, 811 (Tex. 2019). When both parties move for summary judgment on the same issue, we consider the evidence presented by both parties and determine all questions presented. *Id.*

A question of statutory construction is a legal one, which we also review de novo. *Atmos Energy Corp. v. Cities of Allen*, 353 S.W.3d 156, 160 (Tex. 2011). Our objective in construing a statute is to give effect to the Legislature's intent, looking first to the "plain and common meaning of the statute's words." *MCI Sales & Serv., Inc. v. Hinton*, 329 S.W.3d 475, 500 (Tex. 2010). We

9

may also consider the "circumstances under which the statute was enacted[] and the consequences of a particular construction." *Atmos Energy*, 353 S.W.3d at 160.

In discerning a statute's plain and common meaning, "[w]e presume the Legislature enacted the statute 'with complete knowledge of the existing law and with reference to it.'" *In re Bridgestone Ams. Tire Operations, LLC*, 459 S.W.3d 565, 572 (Tex. 2015) (quoting *Acker v. Tex. Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990)). When "a legislature has used a word in a statute in one sense and with one meaning, and subsequently uses the same word in legislating on the same subject-matter," its meaning in the subsequent statute will ordinarily be the same. *Colorado County v. Staff*, 510 S.W.3d 435, 452 (Tex. 2017). This rule applies when the words or phrases at issue are "substantially the same" and holds particular force where their meaning in the earlier act is clear or has been adjudicated. *Id.* at 452 & n.70 (citing *L & M-Surco Mfg., Inc. v. Winn Tile Co.*, 580 S.W.2d 920, 926 (Tex. App.—Tyler 1979, writ dism'd)).

## II.    Applicable law

The law governing ownership of submerged lands in Texas has a long history. We begin in 1836: the year Texas achieved independence from Mexico. Hans W. Baade, *The Historical Background of Texas Water Law—A Tribute to Jack Pope*, 18 ST. MARY'S L.J. 1, 29 (1986). In 1836, the Republic of Texas ratified its first constitution. *Manry v. Robison*, 56 S.W.2d 438, 443 (Tex. 1932). This constitution retained "all laws then in force in Texas, and not inconsistent with the Constitution," including the Mexican civil law and the laws of Coahuila and Texas, formerly a Mexican state. *Motl v. Boyd*, 286 S.W. 458, 465 (Tex. 1926). Such laws were to remain in effect "until declared void, repealed, altered, or expired by their own limitation." *Id.*

In December 1837, the Congress of the Republic of Texas passed the Navigable Stream Statute. *Id.* at 466. That statute prescribes how lands "lying on navigable water courses" and streams should be surveyed. Act approved Dec. 14, 1837, 2d Cong., R.S., §§ 21, 42, 1837 Repub. Tex. Laws 62, 70, *reprinted in* 1 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 1412 (Austin, Gammel Book Co. 1898) [hereinafter Act approved Dec. 14, 1837]. Specifically, the Navigable Stream Statute provides that survey lines may not cross navigable water courses and streams:

> That all lands surveyed for individuals lying on navigable water courses, shall front one half of the square on the water course, and the line running at right angles with the general course of the stream, if circumstances of lines previously surveyed under the laws will permit, and all others not on navigable water courses shall be square if previous lines will permit; and under no circumstances shall any one grant be located in more than two surveys.

*Id.* The statute defines "navigable streams" as "all streams of the average width of thirty feet . . . so far up as they retain that average width." *Id.* § 42. In January 1840, Texas adopted the English common law, but only "so far as it [was] not inconsistent with the Constitution or the Acts of Congress [then] in force," which included the Navigable Stream Statute. Act approved Jan. 20, 1840, 4th Cong., R.S., § 1, 1840 Repub. Tex. Laws 1, 3, *reprinted in* 2 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 177 (Austin, Gammel Book Co. 1898) [hereinafter Act approved Jan. 20, 1840]; *see also Motl*, 286 S.W. at 465.

In *Motl v. Boyd*, this Court shed further light on the meaning of "navigable stream" under the Navigable Stream Statute. 286 S.W. at 467. We held that "[a] water course, river, or stream consists of a bed, banks, and a stream of water" with an average width of 30 feet across the "entire bed of the stream." *Id.*

Three years after *Motl*, the Legislature passed the Small Bill, validating certain "patents to and awards of lands" that had violated the Navigable Stream Statute by crossing "navigable

11

streams." TEX. REV. CIV. STAT. art. 5414a(1)–(2). In *State v. Bradford*, we recognized that although "lands underlying navigable waters are held in trust by the state for the use and benefit of all the people," the Legislature has authority to "validate the titles to the land for which patents and awards have issued." 50 S.W.2d at 1069, 1077. We held that the Legislature did so in the Small Bill, in compliance with our Constitution, when it "decided to retain the consideration received for the land and confirm to the landowners that which they had already bought and paid for or for which the state held their outstanding obligations." *Id.* at 1077.

III. **The Small Bill validates patents conveying the beds of navigable streams, whether above or below the tide line.**

The Small Bill does not define "water course" or "navigable stream." But as noted, when the Legislature uses the same word or phrase again in legislating on the same subject matter, the meaning of that word or phrase ordinarily remains the same. *Colorado County*, 510 S.W.3d at 435 & n.70. Here, though the Navigable Stream Statute and Small Bill use slightly different wording in describing the bodies of water within their reach, the terms at issue are "substantially the same."[8] *Compare* TEX. REV. CIV. STAT. art. 5414a (addressing water courses and navigable streams), *with* Act approved Dec. 14, 1837, §§ 21, 42 (addressing navigable water courses, streams, and navigable streams). Our previous cases have concluded that the Small Bill and Navigable Stream Statute affect the same subject matter, as the Small Bill validates surveys made invalid by the Navigable Stream Statute.[9] We therefore look to the meaning of "navigable stream" in the Navigable Stream Statute in order to determine its meaning in the Small Bill.

---

[8] *Colorado County*, 510 S.W.3d at 435 & n.70.

[9] *Heard*, 103 S.W.2d at 730, 734 (analyzing whether the Small Bill gave title to a portion of the bed of the Mission River, "a navigable stream as defined by [the Navigable Stream Statute]"); *Bradford*, 50 S.W.2d at 1070

12

**A. Interpreted in light of the civil law, the Navigable Stream Statute applies to portions of "navigable streams" below the tide line.**

The Navigable Stream Statute defines "navigable streams" as "all streams of the average width of thirty feet . . . so far up as they retain that average width." Act approved Dec. 14, 1837, § 42. Neither this definition nor the law in force at the time of its enactment indicate that the tide plays any role in setting the boundaries of a navigable stream.

Because we presume the Legislature acted with knowledge of existing law, we construe the Navigable Stream Statute "in connection and in harmony with [that] law, and as a part of a general and uniform system of jurisprudence." *McBride v. Clayton*, 166 S.W.2d 125, 128 (Tex. 1942). As discussed, the Republic of Texas followed the civil law of Mexico when the Navigable Stream Statute was enacted. *Bradford*, 50 S.W.2d at 1074. To decide whether the statute includes portions of navigable streams below the tide, we therefore examine the civil-law meaning of the term navigable stream. *See McBride*, 166 S.W.2d at 128.

The civil law recognized two classes of streams: rivers and creeks. *See* Wallace Hawkins, *Title to River Beds in Texas and Their Boundaries*, 7 TEX. L. REV. 493, 508 (1929). Navigable streams generally fall within the category of civil-law "rivers," defined as "a mass of water united between two banks, which runs perpetually from time immemorial." FREDERIC HALL, THE LAWS OF MEXICO: A COMPILATION AND TREATISE § 1406 (1885) [hereinafter HALL'S MEXICAN LAWS]. The beds of these perennial rivers were owned by the state. Hawkins, *supra*, at 508–09. Texas courts have since conflated the terms river, water course, and stream, recognizing their similar geological features. *Motl*, 286 S.W. at 467 ("A water course, river, or stream consists of a bed,

---

(noting that if the river in question was deemed a "statutory navigable stream," then "the title to the land in the river bed belongs to the state, subject to the provisions of the Small Bill").

banks, and a stream of water."); *see also* Hawkins, *supra*, at 510–11 (explaining that the Navigable Stream Statute's drafters intended to equate water course and stream with civil-law rivers).

"[I]n the language of the civil law," rivers existed both above and below the tide line, and the "navigable" character of some rivers connoted only that they were "capable of being navigated"—*i.e.*, of "admitting floats." JOSEPH ANGELL, TREATISE ON THE RIGHT OF PROPERTY IN TIDE WATERS AND IN THE SOIL AND THE SHORES 79 (2d ed. 1847) [hereinafter TREATISE ON TIDE WATERS]. The civil law acknowledged that rivers "follow their course to the sea." HALL'S MEXICAN LAWS § 1388. Rather than defining rivers to exclude tidal influence, the civil law recognized that they continue below the tide: "A bank is the margin and shore of the sea *or river*, that is, the place or space which their waters cover at the time when they swell most with their periodical flood-tide and ebb-tide, whether in winter or summer, without going out of their bed." *Id.* at § 1409 (emphasis added).

Thus, under the civil law, navigable streams and other rivers extended both above and below the tide. The Republic Congress included its own definition of navigable stream in the Navigable Stream Statute, but nothing in that definition—which focuses on the stream's width— indicates that Congress modified the term's civil-law meaning with respect to the tide. Accordingly, we hold that in light of the civil law, the Navigable Stream Statute prevents survey lines from crossing "navigable streams" both above and below the tide line. *See Allen Sales & Servicecenter, Inc. v. Ryan*, 525 S.W.2d 863, 866 (Tex. 1975) ("[S]tatutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and subject thereto unless the contrary is clearly indicated.").

**B. Because the Small Bill validates surveys invalidated by the Navigable Stream Statute, it also covers the beds of "navigable streams" below the tide line.**

Because the Small Bill refers to and validates the same surveys originally rendered invalid by the Navigable Stream Statute, an identical interpretation of the term navigable stream as used in the Small Bill is appropriate. "It is presumed in construing statutes that several acts or provisions relating to the same subject [are] intended to be consistent and to operate in harmony," and nothing in the Small Bill rebuts this presumption. *Connors v. Connors*, 796 S.W.2d 233, 237 (Tex. App.—Fort Worth 1990, writ denied).

The Small Bill provides in pertinent part:

Sec. 1. All patents to and awards of lands lying across or partly across water courses or navigable streams and all patents and awards covering or including the beds or abandoned beds of water courses or navigable streams or parts thereof, which patents or awards have been issued and outstanding for a period of ten years from the date thereof and have not been cancelled or forfeited, are hereby confirmed and validated.

Sec. 2. The State of Texas hereby relinquishes, quit-claims and grants to patentees and awardees and their assignees all of the lands, and minerals therein contained, lying across, or partly across watercourses or navigable streams, which lands are included in surveys heretofore made, and to which lands patents or awards have been issued and outstanding for a period of ten years from the date thereof and have not been cancelled or forfeited, and the State of Texas hereby relinquishes, quit-claims and grants to patentees and awardees and their assignees all of the beds, and minerals therein contained, of water courses or navigable streams . . . ; provided that nothing in this Act contained shall impair the rights of the general public and the State in the waters of streams or the rights of riparian and appropriation owners in the waters of such streams . . . ; nor shall relinquish or quit-claim any number of acres of land in excess of the number of acres of land conveyed to said patentee or awardees in the original patents granted by the State . . . ; provided that this Act shall not in any way affect the State's title, right or interests in and to the sand and gravel, lying within the bed of any navigable stream within this State, as defined by Article 5302, Revised Statutes of 1925 [the Navigable Stream Statute].

TEX. REV. CIV. STAT. art. 5414a(1)–(2). The Bill was enacted in 1929 "[t]o cure, as far as possible, the defect in the claim of the owners whose patents and locations and awards cross navigable

15

streams" in violation of the Navigable Stream Statute. *Bradford*, 50 S.W.2d at 1071. To carry out this purpose, the Small Bill expressly adopts the Navigable Stream Statute's definition of "navigable stream"—a definition that, as we have said, includes streams both above and below the tide line. TEX. REV. CIV. STAT. art. 5414a(2) ("[N]avigable stream . . . as defined by Article 5302 [the Navigable Stream Statute] . . . .").

Beyond incorporating the Navigable Stream Statute's definition, the Small Bill's use of comprehensive language further indicates the Legislature's intent to validate surveys crossing both tidal and nontidal portions of navigable streams. The Bill validates "*[a]ll* patents to and awards of land lying across or partly across water courses or navigable streams and *all* patents and awards covering or including the beds or abandoned beds of water courses or navigable streams or parts thereof." *Id.* art. 5414a(1) (emphases added). It also provides that the State "relinquishes, quit-claims[,] and grants . . . *all* of the lands" and beds included in the relevant surveys. *Id.* art. 5414a(2) (emphasis added).

The Small Bill's use of "all" matters. With the Small Bill, the Legislature implemented "the public policy of this State to deal fairly with those who have purchased its public lands and for some reason have not received the correct acreage so purchased and conveyed." *Bradford*, 50 S.W.2d at 1071. Nothing in the Small Bill indicates the Legislature intended to deal less fairly with those to whom the State had sold parts of the beds of navigable streams lying below the tide line. The Small Bill never references the tide, never carves out tidally influenced areas, and never shows a preference for beds of navigable streams located above the tide. We see no reason to introduce a tidal distinction where the Legislature made none.

16

For these reasons, the plain meaning of the term "navigable stream" that the Legislature chose in the Small Bill is identical to its meaning under the Navigable Stream Statute, which includes portions of streams below as well as above the tide line. By its express terms, therefore, the Small Bill validates patents including the beds of those streams.

### C. The common law's adoption in 1840 does not change our conclusion.

The Commissioner and our dissenting colleagues rely primarily on our State's 1840 adoption of the common law to argue that the Navigable Stream Statute and Small Bill govern only portions of navigable streams above the tide. They contend that tidal and non-tidal portions of streams are governed by different systems of jurisprudence: the Navigable Stream Statute and Small Bill apply to portions above the tide line, while the English common law governs portions below the tide. Specifically, the Commissioner contends that tidally influenced portions of rivers or streams are treated as tidewater and thus cannot be "navigable streams." The dissent similarly argues the common law renders below-tide portions of streams state-owned, so the Navigable Stream Statute's protections are unnecessary. *Post* at __ (Green, J., dissenting). Both cite the common-law rule that tidally influenced waters are considered an "arm of the sea" owned by the sovereign and governed by different rules than non-tidal waters. *Post* at __.

Although these are correct statements of the common law, they do not impact our interpretation of the statutory term "navigable stream" in this case. We agree with our dissenting colleagues that there are key differences in the legal rules governing ownership of submerged land above and below the tide line. All agree on how those rules apply here: the State owns the beds of navigable streams on both sides of the line, and it can convey those beds to private owners if it follows the proper steps to do so.

17

As we have explained, the civil law defined navigable streams and other rivers as extending both above and below the tide line without distinction, and the state owned the beds of navigable streams on both sides of the line. HALL'S MEXICAN LAWS §§ 1388, 1406. As the Commissioner and dissent rightly explain, the common law subscribed to different rules, treating ownership of streambeds above and below the tide line differently. When Texas adopted the common law in 1840, we did so insofar as "not inconsistent with the Constitution or the acts of Congress then in force." *Motl*, 286 S.W. at 465; *see also* Act approved Jan. 20, 1840, § 1. The Commissioner and dissent fail to recognize that the common law's adoption did not alter the meaning of navigable stream or the state-owned status of the stream's bed either above or below the tide.

Above the tide line, the common law was not adopted because it was inconsistent with the existing law in Texas at the time. *See Motl*, 286 S.W. at 465. Under the civil law as modified by the Navigable Stream Statute, the beds of perennial streams and of streams with an average width of thirty feet were state-owned and protected against certain types of sales. *Manry*, 56 S.W.2d at 446. But under the common law, the beds of streams above the tide were owned by riparian landowners. *Id.* at 445. We have recognized that Texas "ignored [the common law's] rule that grants on streams above tidewater carry title to the thread of the stream" because the civil law, as modified by the Navigable Stream Statute, is better suited to our conditions. *Id.* at 447.

Below the tide line, adopting the common-law rule governing streambed ownership changed nothing, as the common and civil laws on the subject were the same. *See id.* (perennial streambeds below tide state-owned under civil law); JOSEPH ANGELL, TREATISE ON THE LAW OF WATERCOURSES 729–32, §§ 542–45 (6th ed. 1854) [hereinafter LAW OF WATERCOURSES] (streambeds below tide state-owned under common law). The common law provided that

"navigable streams" were state-owned and protected from sale, but such streams existed *only* "within tidewater limits"—*i.e.*, below the tide line. *Manry*, 56 S.W.2d at 446; LAW OF WATERCOURSES 729–32, §§ 542–45; TREATISE ON TIDE WATERS 75–76. The dissent has argued we must "harmonize" the civil- and common-law systems by holding that only common-law rules apply below the tide. *Post* at __. But there is nothing to harmonize when the rules are the same.[10]

For these reasons, the disputed issue is not what rules apply to determine ownership of the soil underlying navigable streams. *Cf. post* at __. Rather, the parties dispute what the term "navigable stream" means, and thus what land was included when the Small Bill validated conveyances of the state-owned beds of such streams. Parts III.A. and B. explain why that term includes below-tide portions of streams under the civil law and the Navigable Stream Statute, and therefore under the Small Bill as well.

Contrary to the dissent's position, the adoption of the common law did not change this meaning. *Cf. post* at __. Indeed, by incorporating the Navigable Stream Statute's definition of navigable stream into the Small Bill, the Legislature carried forward a definition that must be interpreted in light of the civil law. *See Sabriego v. White*, 30 Tex. 576, 587 (1868) (holding courts cannot use common law to interpret statute passed before 1840). As we explained in *Manry v. Robison*, "[t]he [Navigable Stream Statute] was not specifically amended by the act of 1840 [adopting the common law], nor by any subsequent law, and, in the absence of some specific

---

[10] To the extent the dissent suggests the Navigable Stream Statute never applied to below-tide portions of navigable streams because the common law covered them, we note that the common law was not in effect at the Navigable Stream Statute's enactment and thus has no bearing on the Statute's original scope.

19

amendment we should give it the meaning which it had at the time of its enactment"—that is, a civil-law meaning. 56 S.W.2d at 447.[11]

Nor did the common law's adoption replace the Navigable Stream Statute below the tide. *Cf. post* at __. The Navigable Stream Statute protects state-owned land in a manner unique and inconsistent from the common law: it prohibits survey lines from crossing navigable streams. *See* Act approved Jan. 20, 1840, § 1 (common law not adopted where inconsistent with current law).

In any event, our conclusion that the meaning of the term navigable stream includes portions of the stream below the tide line is entirely consistent with the common law's conception of navigable streams, which as noted existed only within tidewater limits. Thus, even if the common law altered the Small Bill's definition of "navigable stream," we do not see how this would support the dissent. Under that definition, the Small Bill would validate *only* surveys crossing tidewater sections of streams: the opposite result from that reached by the dissent, *post* at __, and one calling into question every above-tide streambed conveyance.

The Commissioner and dissent emphasize that several opinions discussing navigable streams limit their application to streambeds above the tide; thus, they posit, the Navigable Stream Statute and Small Bill must not apply below the tide. *Post* at __. We cannot agree. Although the common and civil laws differed markedly in their treatment of navigable stream beds above the

_____

[11] The dissent complains that our interpretation renders the common law meaningless. *Post* at __. This complaint flies in the face of the 1840 act, which expressly provides that the common law applies only to the extent it is not inconsistent with the acts in place at that time, which include the Navigable Stream Statute. The common law can also be modified by subsequent statutes, such as the Small Bill's re-enactment of the Navigable Stream Statute's definition. *See Dugger v. Arredondo*, 408 S.W.3d 825, 829 (Tex. 2013).

tide, the rules below the tide line were the same. Naturally, differences between the rules above the tide have been litigated more frequently.[12]

In particular, the dissent contends *Manry* requires application of the common law to navigable streams below the tide because the common law recognized that different rules apply above and below the line. *Post* at __. The dissent makes too much of this portion of *Manry*, however. In *Manry*, we refused to adopt a *particular* common-law rule applicable "only within tidewater limits" in deciding whether abandoned riverbeds above the tide line passed to riparian owners or the State. *Manry*, 56 S.W.2d at 448. The reason we gave is the one just discussed: the civil law in force in 1840, as modified by the Navigable Stream Statute, is inconsistent with the common law above the tide. *Id.* at 446. But that reason says nothing about whether the civil-law and statutory definition of navigable stream is inconsistent with the common-law definition below the tide. Because the authorities just discussed show the definitions are the same, there is no conflict to resolve.

**D.    The Small Bill is a valid conveyance of public-trust submerged land both above and below the tide line.**

The Commissioner and the dissent also argue that the Small Bill does not overcome the public trust doctrine with respect to submerged streambeds below the tide line. It has long been the law in Texas that navigable waters and their beds—both above and below the tide—are "reserved to the State for the use of the public generally." *Lorino v. Crawford Packing Co.*, 175

---

[12] *See Luttes*, 324 S.W.2d at 192 (civil-law tide line applies to civil-law grants and common-law tide line applies to common-law grants);.*Manry*, 56 S.W.2d at 449 (abandoned riverbeds); *Motl*, 286 S.W. at 468 (public rights of navigation over floodwaters).

S.W.2d 410, 414 (Tex. 1943) (below tide); *Bradford*, 50 S.W.2d at 1075 (above tide).[13] Private parties may not have the exclusive right to the enjoyment of streambeds "unless and until the Legislature has granted such right." *Lorino*, 175 S.W.2d at 414. We presume "that there has not been any act of the State divesting itself of title," *id.*, and we construe grants purporting to convey these lands "strictly . . . against the grantee," *Bradford*, 50 S.W.2d at 1075. To convey public-trust lands, the Legislature must use "plain and positive language":

> In view of the importance of this matter to the state and the whole people, the courts of this state have consistently held that all grants with respect to lands under navigable waters, such as river beds and channels, are strictly construed against the grantee; that, if there is any ambiguity in the act, it will be construed in favor of the state; and, unless the act contains plain and unmistakable language expressly conveying the land under river beds and channels, it will not be construed to include them. In other words, before a statute will be construed to include land under navigable waters, such as river beds and channels, it will have to be expressed in plain and positive language and not in general language.

*Bradford*, 50 S.W.2d at 1075.[14]

The Commissioner and the dissent recognize that the Small Bill expressly "grants . . . the beds . . . of water courses or navigable streams," and they concede this grant is valid as to streambeds above the tide. TEX. REV. CIV. STAT. art. 5414a(2); *see post* at __. Yet they contend the Small Bill does not contain the requisite "plain and positive language" to convey the beds of streams below the tide, even though the language just quoted makes no tidal distinction. *Post* at __. They advance several arguments in an effort to support this position, including the Commissioner's contention that the public trust doctrine applies with "heightened standards" to

---

[13] *See also In re Adjudication of Water Rights of Upper Guadalupe Segment of Guadalupe River Basin*, 642 S.W.2d 438, 444 (Tex. 1982) ("Texas holds the title to the waters in a navigable stream in trust for the public.").

[14] As these authorities show, the dissent is incorrect that only portions of navigable stream beds below the tide require express legislative relinquishment of state ownership. *Post* at __.

below-tide streambeds and the inconsistent language Texas law has used to describe navigable waters. We are not persuaded.

As just explained, the public trust doctrine applies equally to navigable stream beds above and below the tide line,[15] as does the term navigable stream. Thus, if the Small Bill satisfies the public trust doctrine as to conveyances including above-tide navigable stream beds, as the Commissioner and dissent admit it does, the same must be true of its effect below the tide.

In *Bradford*, we upheld the Small Bill against numerous constitutional challenges and held it was a permissible statute enacted to "confirm and validate titles to land whose survey lines cross[ed] the bed" of a navigable stream. *Bradford*, 50 S.W.2d at 1077. In doing so, we necessarily concluded the Small Bill satisfied the public trust doctrine. *See id.* at 1075–76, 1079. But we never relied upon the presence or absence of the tide in the navigable stream at issue, nor did we exclude navigable streams below the tide from our holding. Instead, we relied upon the Legislature's intent in enacting the Small Bill: to make existing patentees and awardees whole. *Id.* at 1075–76.

> [T]he Small Bill did not undertake to give to the patentees and awardees and their assignees anything belonging to the state. The state issued the patents and awards; the state received the purchase price for the lands patented and awarded; the state still retains the consideration paid therefor; and, in the exercise of its power, the Legislature decided to retain the consideration received for the land and confirm to the landowners that which they had already bought and paid for or for which the state held their outstanding obligations.

---

[15] *See Lorino*, 175 S.W.2d at 414; *Bradford*, 50 S.W.2d at 1075.

*Id.*[16] "That the state has authority to validate the titles of the land lying in the beds of navigable streams issued in good faith . . . rests upon many precedents and sound authorities . . . ." *Id.* at 1077. Neither these statements nor anything else in *Bradford* indicates the Legislature chose to retain the consideration paid by *all* patentees and awardees with surveys violating the Navigable Stream Statute while validating only *some* of those surveys. If the Small Bill is a sufficiently plain and positive conveyance of public-trust beds of navigable streams above the tide, it is a valid conveyance of such beds below the tide as well.

Accepting the dissent's conclusion that the Small Bill is not a valid conveyance would require overruling *Bradford*, which we decline to do. We recently noted that in cases involving statutory construction, "stare decisis has its 'greatest force.'" *Worsdale v. City of Killeen*, 578 S.W.3d 57, 68–69 (Tex. 2019). We see no reason to disturb *Bradford*—something even the Commissioner has not asked us to do.

The Commissioner and the dissent next argue that the Small Bill's reference to beds of "navigable streams" and "watercourses" is not a plain and positive conveyance of submerged land below the tide line in light of the inconsistent language Texas authorities have used to distinguish between tidal and non-tidal waters. The Commissioner and dissent further contend that a conveyance of the bed of a "navigable stream" is too imprecise and that a below-tide conveyance must use more particular language. *Post* at __. The Commissioner notes that the Navigable Stream Statute does not define "water course"—a term it uses interchangeably with "stream." "Water course," the Commissioner argues, "referred to inland streams that were not tidally influenced" in

---

[16] *See also Bradford*, 50 S.W.2d at 1077 ("The state having sold and conveyed the lands for a certain consideration, and received and retained the consideration paid therefor, saw fit to retain the money paid or to be paid and validate the titles to the land for which patents and awards have issued.").

the 1830s. In support of this proposition, the Commissioner notes that two treatises by the same author handle "water courses" and "tide waters" separately. But both treatises acknowledge that the "navigable stream" concept blurs tidal and non-tidal lines. *See* LAW OF WATERCOURSES 738, § 550; TREATISE ON TIDE WATERS 79. They discuss the purely tidal nature of navigable streams under the common law, and they discuss the civil law's use of the term to include areas above and below the tide. LAW OF WATERCOURSES 738, § 550; TREATISE ON TIDE WATERS 79. We find the Commissioner's argument regarding water courses unclear at best.

For its part, the dissent contends that "navigable water"—not navigable stream—is the term Texas uses to denote tidally influenced waters, and the Small Bill's failure to use that term means that it does not apply below the tide. *Post* at __. But the very cases the dissent cites refute this position. In *Bradford*, we stated that navigable waters include navigable streams. *Bradford*, 50 S.W.2d at 1069 ("[T]he state is the owner of the soil underlying the navigable waters, *such as navigable streams*, as defined by statute . . . ."); *cf. post* at __. Likewise, *Manry* and *Seabrook Land Co. v. Lipscomb* refer to "tidewater sections of navigable streams." *Manry*, 56 S.W.2d at 446; *Seabrook Land Co. v. Lipscomb*, 331 S.W.2d 429, 433 (Tex. App.—Houston 1960, writ dism'd by agr.); *cf. post* at __.

The Commissioner and the dissent next claim that our holding disturbs the rules of streambed ownership in Texas, but we are simply holding that the Small Bill—a proper legislative conveyance of submerged streambeds patented one hundred years ago—validates title to all of the land the patentees paid for. *See Bradford*, 50 S.W.2d at 1071. Moreover, adopting the dissent's view would cause the true disruption. As we have explained, the dissent's view would undermine

25

the Small Bill's validation of patents to streambeds above the tide. What is more, it would call into question the City of Houston's ownership of the Houston Ship Channel.

The Houston Ship Channel, a substantial portion of which is below the tide, was conveyed by the Legislature using language similar to that in the Small Bill. *See* TEX. REV. CIV. STAT. art. 7467a (1925) (conveying beds and abandoned beds of certain "rivers, streams[,] and other channels"). If the Small Bill's reference to navigable stream beds is insufficiently specific to convey beds below the tide, as the dissent contends, the Ship Channel conveyance is even more suspect.[17] The dissent counters that the Ship Channel conveyance was sufficiently specific because it applied only to streambeds within the corporate limits of eight cities. *Post* at __. But that statement is simply not responsive to the dissent's own concern: narrowing the scope of the conveyance to streambeds within certain cities has nothing to do with whether a conveyance of those streambeds is sufficiently specific to include portions of the beds below the tide.

Finally, the Commissioner points out that a motive for the Small Bill was to cure unrest in arid and semi-arid areas of the State in response to our *Motl* decision. In those areas, the banks of navigable streams are frequently wider than the water they contain, and claims were made after *Motl* that patents including land between these banks violated the Navigable Stream Statute. But the Commissioner's view that the Small Bill applies only in those upland areas of Texas runs afoul of the Bill's plain language and ignores parts of our *Motl* decision. Although *Motl* did render

---

[17] The dissent also argues that Justice Reavley's personal footnote in *Coastal Industrial Water Authority v. York*, a case considering the Houston Ship Channel, requires that we apply the common law below the line of mean high tide. *Post* at __. But read carefully, that footnote addresses his desire that the case not affect the "boundary of private ownership to lands within reach of the tide." *York*, 532 S.W.2d at 952 n.1. In other words, it concerned ownership disputes arising from the changing of the tide line over time. *Id.*

thousands of acres of land in drier areas of Texas susceptible to title disputes,[18] *Motl* did not limit its holding to above-tide navigable streams. *Motl* construed the statutory definition of navigable stream generally, repeatedly mentioning watercourses in other regions of Texas—including near the Gulf—without excluding them from its reach. Indeed, this Court has applied *Motl*'s definition to a grant affecting the Mission River, a river that "empties into a bay, which is an arm of the gulf" just ten miles from the grant at issue there. *Heard*, 103 S.W.2d at 729–30. Thus, nothing in *Motl* changes our conclusion that the Small Bill, by its plain language, applies to all parts of navigable streams.

### E. Our holding that the Small Bill conveys the beds of "navigable streams" below as well as above the tide will have limited impact.

The Commissioner warns that dire consequences will follow our holding that the Small Bill conveys submerged beds of navigable streams. But as the Club explains, a holding that the Small Bill encompasses portions of navigable streams below the tide line will affect very few properties because the Small Bill carefully defines its parameters.

The Small Bill validates and confirms grants meeting four requirements: (1) patents and awards (2) granted at least ten years before the Small Bill's 1929 enactment (3) lying across or partially across (4) watercourses or navigable streams—terms encompassing water features that meet certain criteria defined by Texas law. TEX. REV. CIV. STAT. art. 5414a; *see Hoefs v. Short*, 273 S.W. 785, 787 (Tex. 1925) (defining watercourse); Act approved Dec. 14, 1837, § 42 (defining navigable stream). The Commissioner expresses particular concern about interpreting the Small Bill to reach land underlying the Gulf of Mexico, but he has presented no evidence that any survey

---

[18] *See* Hawkins, *supra*, at 501–02, 513–14 (noting that stream beds in the arid portions of Texas are often of "enormous width" and are therefore navigable streams under *Motl* even if their flowing waters are quite narrow).

27

lines cross the Gulf. Even if some did, the Gulf is not a watercourse, nor is it a navigable stream. Thus, those surveys would not be saved by the Small Bill. *See* TEX. REV. CIV. STAT. art. 5414a. In addition, the Small Bill quitclaims only the number of acres of land necessary for the patentee to be made whole. Finally, our holding does not affect the State's ownership of land below mean high tide and outside the gradient boundary of a watercourse or navigable stream because those areas are not included within the Small Bill's scope.

## IV. We remand for a determination of whether the bayou is a "navigable stream" or "watercourse."

In light of our conclusion that the Small Bill encompasses the beds of navigable streams above and below the tide, we next consider whether the Club was entitled to summary judgment that Lone Oak Bayou is a "navigable stream" or "watercourse" within the Bill's scope.

The Commissioner argues that the Club has failed to prove the Lone Oak Bayou is a navigable stream or watercourse as a matter of law; thus, the court of appeals erred in affirming summary judgment in the Club's favor. In response, the Club argues the Commissioner waived this argument, as he did not assert it in the courts below. Alternatively, the Club argues it has established the bayou is a navigable stream or watercourse as a matter of law. We agree with the Commissioner.

As a preliminary matter, we disagree with the Club's position that the Commissioner waived this issue by failing to raise it in the court of appeals. In the trial court, the parties filed cross-motions for summary judgment; thus, "each party [had] the burden of establishing that it [was] entitled to judgment as a matter of law." *Tarr v. Timberwood Park Owners Ass'n*, 556 S.W.3d 274, 278 (Tex. 2018). Because the Club asked the court to apply the Small Bill, the Club had the burden to prove it applied as a matter of law. *Bombardier Aerospace Corp. v. SPEP*

28

*Aircraft Holdings, LLC*, 572 S.W.3d 213, 221 (Tex. 2019). As the non-movant, the Commissioner was not required to produce evidence negating the Small Bill's application. *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014) (explaining that movant's summary judgment motion "must stand or fall on [its] own merits, and the non-movant's failure" to produce contrary evidence does not affect the movant's right to summary judgment). Thus, the Commissioner did not waive this issue.

Turning to the merits, we conclude that summary judgment in favor of the Club was improper because the Club failed to establish as a matter of law that all of Lone Oak Bayou within the Barrow Survey is a navigable stream or watercourse. "A water course, river, or stream consists of a bed, banks, and a stream of water." *Motl*, 286 S.W. at 467; *see also Hoefs*, 273 S.W. at 786–87 ("[A] stream in order to be a natural water course to which water rights attach must have bed, banks, a current of water, and a permanent source of water supply . . . ."). To be a statutory "navigable stream," the average width between the banks must be 30 feet, and the stream continues "so far up as [it] retain[s] that average width." *Motl*, 286 S.W. at 466 (quoting 1 SAYLES' EARLY LAWS OF TEXAS 266, 271). We measure the distance between a stream's banks considering the "entire bed of the stream": the land between the horizontal "gradient boundary" on each bank. *Id.* at 467; *Brainard v. State*, 12 S.W.3d 6, 15–18 (Tex. 1999) (discussing gradient boundary surveys in detail), *disapproved of on other grounds by Martin v. Amerman*, 133 S.W.3d 262, 267–68 (Tex. 2004).

We have explained that a stream's gradient boundary is "located midway between the lower level of the flowing water that just reaches the cut bank, and the higher level of it that just does not overtop the cut bank." *Diversion Lake Club v. Heath*, 86 S.W.2d 441, 447 (Tex. 1935)

29

(quoting *Oklahoma v. Texas*, 265 U.S. 500, 501 (1924)). In other words, it is "that portion of [a stream's] soil which is alternately covered and left bare as there may be an increase or diminution in the supply of water, and which is adequate to contain it at its average and mean stage during an entire year." *Motl*, 286 S.W. at 467.

To constitute a "stream" or "water course" and calculate its gradient boundary, Lone Oak Bayou must have banks. *Id.*; *Brainard*, 12 S.W.3d at 15–19; *Diversion Lake Club*, 86 S.W.2d at 447. The Club has not proven this to be the case. The Club's evidence concerning the presence of banks includes a surveyor affidavit stating that "*[i]n certain areas* Lone Oak Bayou has a defined bank." But the bayou has also "been described as a marsh, for which no banks exist," and for which "a gradient boundary cannot be determined."

Given this evidence, we cannot say conclusively that the bayou has defined banks, nor can we determine their locations along the bayou's waters. Thus, we hold the Club was not entitled to summary judgment that the Small Bill validated the bayou bed's conveyance. A "stream" or "water course" bears that name only insofar as its bed, banks, and stream of water remain. *Motl*, 286 S.W. at 467. On this record, it is possible that some or all of the bayou's waters within the Barrow Survey do not constitute a stream or water course. We therefore remand to the trial court, leaving open the question whether (and, if so, to what extent) the bayou within the Club's tract is a navigable stream or water course such that its conveyance was validated by the Small Bill.

\* \* \*

For these reasons, we hold a fact issue exists regarding whether this patent to a portion of Lone Oak Bayou comes within the Small Bill's scope of validation. We reverse the summary judgment in favor of the Club and remand the cause to the trial court for further proceedings.

_____
J. Brett Busby
Justice

**OPINION DELIVERED:** April 24, 2020